755 N.E.2d 679 (2001)
In the Matter of the Termination of the Parent-Child Relationship of D.J. and E.J., Children, and
Leslie Rohm Pletcher, Mother, Appellant-Respondent,
v.
LaGrange County Division of Family and Children, Appellee-Petitioner.
No. 44A04-0105-JV-203.
Court of Appeals of Indiana.
September 25, 2001.
*680 *681 Randall S. Forbes, Angola, IN, Attorney for Appellant.
Jeffrey S. Arnold, Albion, IN, Attorney for Appellee.

OPINION
ROBB, Judge.
Leslie Pletcher ("Mother") appeals from the trial court's involuntary termination of the parent-child relationship between herself and her two sons, E.J. and D.J. We affirm.

Issues
Mother raises three issues for our review, which we restate as follows:
1. Whether the trial court properly accepted Father's voluntary consent to termination of his parental rights immediately prior to the evidentiary hearing on the involuntary termination of Mother's parental rights;
2. Whether the trial court properly determined that Mother had not remedied the conditions that resulted in the children's removal from her home; and
3. Whether the trial court properly determined that the LaGrange County Division of Family and Children ("LCDFC") had a satisfactory plan for the care and treatment of the children.

Facts and Procedural History[1]
Mother and Marvin Johnson have two children who are the subject of this proceeding, E.J., born January 28, 1997, and D.J., born October 10, 1999.[2] LCDFC became involved with the family in the spring of 1998, approximately one month after they moved into the county from Elkhart County. Marvin's daughter had been adjudicated a child in need of services ("CHINS") in Elkhart County, and when the family moved, LCDFC was asked to supervise the child. Elvie Bontrager, a Case Manager with LCDFC, undertook a home study and found the home to be messy, cluttered and dirty, with several animals in the home. Informal services were offered in the areas of homemaking, budget management, and child care. Ultimately, the services were not successful. The home remained dirty, with dog hair and sometimes dog feces on the floor. There were also roaches in the house. The availability of food varied. The children were often left in the care of Mother's ten-year old daughter and were not well-supervised at other times. There was *682 some concern that Mother was more nurturing toward the animals in the home than toward her own children. E.J. and D.J. were removed from the home on August 8, 1998.
E.J. and D.J. were placed in a foster home and Mother and Marvin were allowed unsupervised visitation with the children. The children usually returned from visitation dirty, tired, and hungry. Mother was offered services, but she failed to cooperate in completing them. Overnight visitation with Mother was ultimately suspended when she left the children in care of strangers. Mother missed scheduled visits and failed to reschedule them. Mother also failed to comply with LCDFC recommendations even after being ordered to do so.
An initial parenting assessment of Mother indicated that she has a personality disorder, has emotional problems, and is overly dependent upon her male companions. A parenting assessment conducted approximately two months prior to the fact-finding hearing in this case was consistent with the initial assessment.
On February 16, 2001, a fact-finding hearing was held. Immediately prior to the presentation of evidence, Marvin voluntarily consented to the termination of his parental rights to E.J. and D.J. after being fully advised of his rights. The court then proceeded to hear evidence regarding the involuntary termination of Mother's parental rights. At the hearing, the original LCDFC caseworker testified regarding the conditions in the home preceding and immediately following the removal of the children. He believed that Mother's parenting skills had deteriorated throughout his contact with the family. R. 66. The subsequent LCDFC caseworker testified that she did not believe that Mother could take care of the children. R. 171. Moreover, she believed that Mother's bad parenting skills supported terminating her parental rights. R. 181. Dr. Cates, who had conducted the parenting assessments of Mother, testified that he did not believe the children should be returned to Mother. R. 143. Finally, the Court Appointed Special Advocate ("CASA") assigned to this case testified that he had not seen any actual commitment on Mother's behalf to performing the tasks required of her to get her children back. R. 214. He also testified that, although Mother "does the best she can, ... she doesn't have enough of the tools" to be a good parent. R. 218.
At the conclusion of the hearing, the trial court indicated that it was ordering termination of Mother's parental rights. A written order followed in which the trial court found that the children had been removed from Mother's home and had been under the supervision of LCDFC for at least fifteen of the last twenty months; there is a reasonable probability that the conditions which resulted in the children's removal would not be remedied because Mother had not developed sufficient parenting skills to provide security, safety, psychological support, and stability for the children, because the "filthy conditions" of the house had not been rectified, and because Mother failed to exercise consistent visitation; LCDFC has a satisfactory plan for the care and treatment of the children; and termination is the children's best interests. Appendix of Appellant at 8, 11. Mother now appeals.

Discussion and Decision

I. Standard of Review
To effect the involuntary termination of a parent-child relationship, LCDFC was required to present clear and convincing evidence establishing the following elements:
(A) one (1) of the following exists:

*683 (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
(ii) a court has entered a finding under IC XX-XX-XX-X.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or
(iii) after July 1, 1999, the child has been removed from the parent and has been under the supervision of a county office of family and children for at least fifteen (15) months of the most recent twenty-two (22) months;
(B) there is a reasonable probability that:
(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or
(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;
(C) termination is in the best interests of the child; and
(D) there is a satisfactory plan for the care and treatment of the child.
Ind.Code § 31-35-2-4(b)(2). This statute applies to the involuntary termination of the parent-child relationship involving a delinquent child or a child in need of services. Ind.Code § 31-35-2-1.
In determining whether the evidence is sufficient to support the judgment terminating parental rights, this court neither reweighs the evidence nor judges the credibility of the witnesses. Matter of K.H., 688 N.E.2d 1303, 1304 (Ind.Ct.App. 1997). We consider only the evidence favorable to the judgment and the reasonable inferences to be drawn therefrom. Id. When reviewing the findings and conclusions upon which a termination of parental rights is premised, we engage in a two-tiered standard of review: we first determine whether the evidence supports the findings, and second, whether the findings support the judgment. In re J.J., 711 N.E.2d 872, 874 (Ind.Ct.App.1999). We will reverse only upon a showing of clear error. Id.

II. Timing of Accepting Father's Voluntary Consent to Termination
Mother first contends that the trial court erred in accepting Marvin's voluntary consent to the termination of his parental rights to E.J. and D.J. immediately prior to conducting the fact-finding hearing on the petition to involuntarily terminate her rights. She contends that this procedure deprived her of a fair and impartial hearing.
In In re J.T., the child's mother argued that the trial court had erroneously accepted the father's voluntary termination of his parental rights prior to the hearing on the termination of her rights because, had the trial court decided in her favor and declined to terminate her rights, she should have had the right to receive child support from the father. 742 N.E.2d 509, 514 (Ind. Ct.App.2001), trans. denied. This court had already determined that termination was appropriate, but nonetheless commented upon the mother's argument. The court noted that the mother's concern was legitimate and that trial courts should "be wary of voluntarily terminating the parental rights of a non-custodial parent before adjudicating the parental rights of the custodial parent. Doing so could materially affect the rights of the child to receive support in the event the custodial parent's rights are not terminated." Id. However, as termination was appropriate and as the trial court had not in fact terminated the father's rights prior to her hearing, but *684 had instead taken the matter under advisement pending her hearing, the court found no error. Id.
Citing J.T., Mother argues that the trial court erred in accepting Marvin's voluntary consent to termination of his parental rights prior to her fact-finding hearing. We agree with the court in J.T. that the practice of accepting a voluntary consent to termination by one parent prior to a fact-finding hearing for the other parent is not a sound practice. However, we decline to hold in this case that such a practice denied Mother a fair trial or constituted reversible error.
As will be discussed in greater detail below, LCDFC presented sufficient evidence to support the termination of Mother's parental rights independent and apart from Marvin's admissions to the allegations of the petitions for termination. As Mother points out, the allegations against Mother and Marvin were identical and set forth in the same petitions for termination. However, LCDFC was required to present sufficient evidence to support the termination of each parent's rights. The trial court's acceptance of Marvin's voluntary consent to termination did not constitute a "pre-judgment" of the merits of the petitions as they related to Mother, nor did his consent affect the outcome of the case. Moreover, Mother's rights were properly terminated and therefore, the trial court's procedure did not materially affect the rights of the children by leaving them without a legitimate source of support. We recognize that this determination is made with the benefit of hindsight, a benefit which a trial court would not have at the time of accepting a voluntary consent to termination from one parent prior to a fact-finding hearing for the other, and therefore, we reiterate that we do not believe that this practice should be routinely used. However, we also reiterate that we do not believe the practice denied Mother a fair trial, and we therefore hold that there was no error.

III. Sufficiency of the Evidence: Remedied Conditions
Mother contends that LCDFC failed to show that the conditions which resulted in the children's removal from her home had not been remedied.
To determine whether there is a reasonable probability that the conditions which resulted in the removal of the children will not be remedied, the trial court should judge a parent's fitness to care for her children at the time of the termination hearing, taking into consideration evidence of changed conditions. In re M.M., 733 N.E.2d 6, 13 (Ind.Ct.App.2000). The trial court must also evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. In re B.D.J., 728 N.E.2d 195, 201 (Ind.Ct.App.2000). The trial court can also reasonably consider the services offered to the parent by LCDFC and the parent's response to those services. Id. A court need not wait until a child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating a parent-child relationship. In re M.M., 733 N.E.2d at 13.
Mother argues that the evidence showed that the conditions which resulted in E.J. and D.J.'s removal from her care had been remedied. Mother points to evidence that the cleanliness of her home had improved since the children were removed and had stayed in that improved condition for nearly two years prior to the fact-finding hearing. Mother also points to evidence that when the children were removed, she was in an abusive relationship with the children's father, but had since ended that relationship and married a man who was not abusive, held a stable job, and provided improved housing. However, the *685 evidence also showed that E.J. and D.J. were not removed from Mother's care due only to cleanliness issues in the home, but also because of concerns over Mother's parenting skills and ability to care for the needs of her children. Those skills had not significantly improved since the children were removed from her home. An LCDFC caseworker testified that not only had Mother's parenting skills not improved, but they had, in his opinion, deteriorated during his contact with the family. The subsequent LCDFC caseworker testified that Mother had poor parenting skills. There was evidence that Mother did not follow through on the recommendations of LCDFC and did not take full advantage of the services offered to her. The mere fact that Mother expressed affection for her children and a desire to have them back with her does not overcome the evidence that Mother was not committed to doing the things necessary to make reconciliation happen. Mother's pattern of conduct both before and during these proceedings supports the trial court's determination that the conditions that resulted in removal would not be remedied.

IV. Satisfactory Plan for the Future
Mother also contends that LCDFC failed to demonstrate that it had a satisfactory plan for the care and treatment of the children following termination because there was evidence of problems in the foster home in which the children were placed.
We acknowledge the testimony regarding the foster home, including an LCDFC caseworker's testimony that they had an issue with trash which was not covered in the foster home. However, the caseworker also testified that the cleanliness issue was only because the standards for foster homes are higher than for the general public and that the issue in no way reached the point of neglect. Moreover, there was testimony, as Mother points out, that the foster mother gave D.J., who is lactose intolerant, milk, which made him ill. However, the foster mother testified that she had not been told by anyone but D.J.'s oldest sister that D.J. was lactose intolerant, and was unable to confirm that until after she had given him the milk. She then immediately switched him to lactose-free formula. There simply is no evidence that the foster home is "was not appreciably superior to the pre-removal home environment." Brief of Appellant at 9. Moreover, we note that LCDFC's plan for the children should parental rights be terminated was not perpetual foster care, but adoption into a "appropriate and suitable... home." Appendix of Appellant at 8, 11. If the foster family desires to adopt the children, the home will have to be approved as an appropriate and suitable environment for the children. LCDFC's plan is satisfactory.

Conclusion
The trial court did not commit reversible error by accepting the father's voluntary consent to termination of his parental rights immediately prior to the fact-finding hearing on the petition to terminate Mother's parental rights. Moreover, LCDFC presented sufficient evidence that the conditions which resulted in the children's removal from Mother's home would not be remedied and that there was a satisfactory plan for the care and treatment of the children following termination. The trial court properly terminated Mother's parental rights, and the judgment is, accordingly, affirmed.
Affirmed.
BAKER, J., and FRIEDLANDER, J., concur.
NOTES
[1] Our new appellate rules provide for the filing of an Appendix containing relevant documents and parts of the Transcript. Ind. Appellate Rules 49, 50. The Transcript is to be prepared by the court reporter and retained by the trial court clerk until notified by the Clerk of our court that all briefing is completed. App. R. 11, 12. At that time, the Transcript is to be transmitted to the Clerk of our court and is provided to us as part of the Record on appeal. App. R. 12. Therefore, it is not necessary for either party's Appendix to contain a copy of the Transcript in its entirety. In this case, Mother has provided, as part of her Appendix, the entire Transcript. We appreciate that counsel undertook to provide in his Appendix a complete record of the relevant proceedings, and we especially appreciate that he has erred on the side of providing too much information rather than too little. However, as one of the purposes of the Appellate Rules revision was to reduce both cost and volume of paper, it is not necessary in the future to provide the Transcript in its entirety as part of the Appendix.
[2] In addition, Marvin and Mother each have a daughter from previous relationships.