**FOR PUBLICATION**



**FILED**

Sep 23 2014, 10:25 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT, K.W.:

**DAVID W. STONE**
Anderson, Indiana

ATTORNEY FOR APPELLANT, B.S.:

**JOHN T. WILSON**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
**CHRISTINE REDELMAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE )
TERMINATION OF THE PARENT- )
CHILD RELATIONSHIP OF A.S. AND )
C.S. (Minor children); )
  )
K.W. (Mother) and B.S. (Father), )
  )
    Appellants-Defendants, )
  )
        vs. )    No.  48A02-1310-JT-913
  )
THE INDIANA DEPARTMENT OF )
CHILD SERVICES, )
  )
    Appellee-Plaintiff. )

APPEAL FROM THE MADISON CIRCUIT COURT
The Honorable G. George Pancol, Judge
The Honorable Jack Brinkman, Senior Judge
Cause Nos. 48C02-1301-JT-2 and 48C02-1301-JT-3

**September 23, 2014**

**OPINION – FOR PUBLICATION**

**PYLE, Judge**

<u>STATEMENT OF THE CASE</u>

B.S. ("Father") and K.W. ("Mother") (collectively, "the parents") appeal the trial court's termination of their parental rights to their minor children, A.S. and C.S. (collectively, "the children"). The parents argue that there was not sufficient evidence to support the termination because some of the trial court's findings of fact were erroneous, and because the trial court's findings of fact did not support its conclusions. We conclude that three of the trial court's findings of fact were erroneous; nevertheless, even without these erroneous findings, the Department of Child Services ("DCS") presented sufficient evidence to support the termination of the parents' parental rights.

We affirm.

<u>ISSUE</u>

Whether DCS produced sufficient evidence to support the termination of the parents' parental rights to the children.

<u>FACTS</u>

The parents have two minor children together, A.S. and C.S. A.S. was born in May of 2009, and C.S. was born in July of 2010. Mother also had a daughter, M.R., who was the half-sister of the children, and a son, A.W., who is their half-brother.[1]

In late February of 2011, the parents and the children were forced to move in with Mother's aunt as a result of a house fire. Three weeks later, on March 12, 2011, three-year-old M.R. took her great aunt's prescription medication out of her purse and

---

[1] The parents' parental rights to A.W. are not at issue in this appeal.

2

swallowed it. Mother noticed that M.R.'s behavior became abnormal and suspected that M.R. had gotten into the medication, but she did not seek medical treatment. Eventually, Father took M.R. to the emergency room, but she went into cardiac arrest and passed away. Following M.R.'s death, DCS conducted an investigation and substantiated death due to neglect and medical neglect against Mother because Mother had suspected that M.R. had gotten into her great aunt's medication and did not seek medical treatment.

On March 14, 2011, an unidentified person contacted DCS with information that Mother and Father were staying in a hotel with their children and were planning to flee the state. Family Case Manager Russell Beatty visited the family at their hotel and determined that they were not attempting to flee the state; they merely did not want to stay in the aunt's house after the death of their daughter. However, during his visit, Mother and Father admitted that they frequently used marijuana, and Father admitted that he sometimes took some of Mother's prescription hydrocodone to treat tooth pain. As a result, DCS tested them for illegal drugs, and they both tested positive for marijuana. In addition, neither Mother nor Father were sure where they would be living in the future.

Due to concerns over the circumstances of M.R.'s death, Mother and Father's drug use, and their uncertain future housing, DCS removed one-year old A.S. and eight-month-old C.S. from the parents and placed them in foster care. Citing the same reasons, DCS filed petitions on March 15, 2011, alleging that both children were children in need of services ("CHINS"). The parents admitted to the allegations, and the trial court adjudicated the children as CHINS on June 15, 2011.

Subsequently, on September 29, 2011, the trial court issued a dispositional order. It ordered the parents to, among other requirements, participate in supervised visitation with the children; maintain appropriate housing and an adequate income; complete substance abuse evaluations, psychological evaluations, and parenting assessments and follow any resulting recommendations; submit to random drug screens; and participate in individual counseling and follow any resulting recommendations.

Initially, the parents were compliant with their court-ordered services. They each completed two substance abuse evaluations—in November 2011 and March 2012. The evaluator for the November 2011 substance abuse evaluations concluded that substance abuse was not a concern for either parent.[2] However, on May 1, 2012, Father tested positive for hydrocodone, which he said that he took to treat sore teeth because he could not afford the dental work that he needed. Mother had a prescription for hydrocodone, but she also occasionally tested positive for levels higher than her prescribed amount.

Other than their drug use, the parents made progress on the remainder of their court-ordered services. They completed psychological evaluations on November 16, 2011 and parenting assessments on March 20, 2012. As a result of their psychological evaluations, the service providers recommended that both parents complete individual therapy. The results of their parenting assessments were positive, and on November 18, 2011, the parents completed the Homebuilder's program, which is a program designed to improve parenting. They also consistently visited the children throughout the CHINS proceedings.

---

[2] The parents' March evaluations are not a part of the record.

As a result of the parents' substantial compliance with their court-ordered services, DCS placed the children on a trial home visit with the parents starting on September 21, 2012. The visit ended early on November 7, 2012, because Mother tested positive for amphetamines and cocaine. DCS next placed the children on a trial home visit with only Father on December 3, 2012. This second trial visit ended after three days because Father tested positive for cocaine.[3]

Subsequently, on January 7, 2013, DCS filed petitions to terminate the parents' parental rights to both of the children. DCS also referred the parents to continue their services. Father began group therapy at the Crestview Center ("Crestview"), but he only attended one or two of those meetings and met with his group's therapist once individually. Father then requested a referral for treatment at Aspire, a community mental health center. He completed the substance abuse evaluation at Aspire and attended group therapy there twice a week for a month. However, he did not attend the other eight weeks of the group therapy program, and Aspire discharged him for non-attendance. Father never contacted the family case manager about continuing treatment elsewhere.

In terms of individual counseling, Father met with a therapist, Phil Taggart ("Taggart"), from June or July of 2012 until the termination proceedings in August 2013. Father consistently attended meetings with Taggart except for a one-month period when he was too depressed to meet. He also could not meet with Taggart during the month

---

[3] Mother also tested positive for cocaine the same day. Father was still positive for cocaine on December 10, 2012. In total, they each tested positive for illegal drugs three times throughout the CHINS and termination proceedings. Father tested positive on May 1, 2012; December 4, 2012; and December 10, 2012. Mother tested positive on October 31, 2012; November 5, 2012; and December 4, 2012.

prior to the termination hearing because he was incarcerated for failing to attend a child support hearing for another child.

Although DCS referred Mother to Crestview, she never sought treatment there. She completed a substance abuse evaluation and mental health assessment at Aspire in March of 2013. However, Aspire discharged her from the program because she did not follow up on the evaluation. Mother subsequently requested and received another referral for Aspire in May of 2013. That month, she completed a second evaluation and assessment and participated in both group and individual therapy. In total, however, she attended only four meetings. She completed a session the day before the termination hearing but had not otherwise attended a meeting in the previous three or four weeks. A therapist at Aspire scheduled two individual sessions with Mother, but she did not show up for either session.

In terms of individual counseling, Mother also met with Father's therapist, Taggart, for six to eight sessions but then told him that she wanted a different therapist. After DCS assigned her a new therapist, she stopped attending therapy. She later testified that she stopped because she had given up hope of getting her children back. She also testified that she was afraid counseling was not enough and that she needed in-patient treatment or she might harm herself or someone else. She was worried, though, that if she sought in-patient treatment, DCS would use it against her as a reason to terminate her parental rights.

Starting in August 2012, Mother and Father participated in home case management with Jennifer Landis ("Landis"), a family consultant, but Landis eventually

6

had to close the parents' case management for non-compliance. There were times when Landis would arrive at the parents' home for a scheduled visit, and no one would answer the door. On some of these occasions, she would later find out that the parents had still been asleep. By the end of May or June of 2013, Landis required the parents to call her before 9 a.m. on the day of each appointment if they did not want her to consider the visit a no-show. When Landis eventually closed the parents' case, neither of them requested to start case management again.

During this time, Landis also supervised the parents' visitation with the children. The parents consistently attended visitation, but they were late—sometimes by as much as thirty minutes or an hour—so many times that Landis had to put a fifteen-minute time limit on the amount of time she would wait for them before canceling. Landis observed that the children seemed "very anxious" if the parents were late. (Tr. 149-50). She had to stop telling the children that the parents were going to visit so that they would not be disappointed if she had to cancel the visitation. The parents did not become timelier once she instituted the fifteen-minute limit.

Throughout the CHINS and termination proceedings, the parents' employment was inconsistent. Mother was unemployed from the time when DCS filed the termination petition in January 2013 until the termination hearing in August 2013. She enrolled in school during part of that year but stopped attending because she was under too much stress. A week prior to the termination hearing, she worked at a maid service for a day but then quit because of back pain. At the time of the hearing, Mother was unemployed but testified that she planned to find a job.

7

Father was self-employed for the year and a half leading up to the termination hearing. He performed services such as working on cars, landscaping, and roofing. However, a month prior to the termination hearing, he was incarcerated for thirty days for failing to attend a child support hearing for another one of his children. He owed around $1,200 in child support for that child. After his incarceration, Father planned to work at a metal factory where he believed there was a good possibility he could get a job because the hiring manager had offered to help him.

In terms of housing, the parents had multiple residences throughout their case. At the time of the termination hearing, Father was incarcerated but planned to move into his father's house upon his release. Mother was living in her mother's two-bedroom house, although she planned on looking for different housing within a month.

During the CHINS and termination proceedings, the children were placed in four different foster homes and with two different relatives. Landis noted that the children demonstrated some behaviors that she thought were concerning. Specifically, C.S. appeared to have some confusion concerning who her real mother was, and A.S. had been having a lot of tantrums in the six months prior to the termination hearing. He also sometimes cried and yelled in order to get what he wanted. At the time of the termination hearing, the children were in a pre-adoptive placement with their aunt, who planned to adopt them if the parents' rights were terminated.[4]

On August 6, 2013, the trial court held an evidentiary hearing on the termination petitions. At the hearing, the family's DCS family case manager testified that she

---

[4] This aunt is a different aunt than the one whose medication M.R. swallowed.

8

believed termination was in the children's best interests because they had been removed from the parents' home for over two years, and because the parents had not completed their services during that time. She also stated that she believed the children needed permanency in their lives. The children's CASA testified that she originally believed the children should be reunited with the parents but had changed her mind because the parents had lived in at least three different homes; she could never reach them; and they were still unemployed and struggling with substance abuse. Taggart testified that continuing "in limbo . . . [was not] fair to the children" and that he "would like to see some stability." (Tr. 120-21). Similarly, Landis testified that "[the] children need[ed] permanency. They need a permanent home and they need it now." (Tr. 151). Finally, the children's therapist testified that she believed a permanent home would help then four-year-old A.S. begin to regulate his behavior.

On October 4, 2013, the trial court issued its findings of fact and conclusions thereon in which it terminated the parents' parental rights. It concluded that there was a reasonable probability that the conditions that resulted in the children's removal from the parents would not be remedied because the parents had not completed any services since their trial home visit and did not have adequate housing or employment. Further, the trial court concluded that the continuation of the parent-child relationship would pose a threat to the well-being of the children and that termination was in their best interests. Finally, the trial court concluded that DCS had a satisfactory plan of adoption for the children. The parents now appeal. We will provide additional facts as necessary.

9

On appeal, the parents argue that the trial court did not prove the following conditions for termination by clear and convincing evidence: (1) that there was a reasonable probability that the conditions that resulted in the children's removal from the parents' home would not be remedied; (2) that there was a reasonable probability that the continuation of the parent-child relationship would pose a threat to the children; (3) that termination was in the children's best interests; and (4) that DCS had a satisfactory plan for the care and treatment of the children.[5] The parents argue that the evidence does not support all of the trial court's findings of fact and that the trial court's findings of fact do not support its conclusions thereon. We will address the evidence and findings of fact supporting each conclusion in turn.

The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *Bester v. Lake Cnty. Office of Family and Children*, 839 N.E.2d 143, 147 (Ind. 2005). A parent's interest in the care, custody, and control of his or her children is "perhaps the oldest of the fundamental liberty interests." *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Accordingly, the involuntary termination of parental rights is the most extreme measure that a court can impose and is designated only as a last resort when all other reasonable efforts have failed. *In re N.Q.*, 996 N.E.2d 385, 391 (Ind. Ct. App. 2013). However, parental rights are not absolute and must be subordinated to the children's

---

[5] Mother also argues that DCS used improper discovery methods. Because she also acknowledges that she waived the argument by failing to object, we need not address that issue. We must also note that Mother and Father submitted separate briefs on appeal. We are combining their arguments, though, for purposes of this decision.

10

interests.  *Id.*  Thus, the law provides for the termination of those rights when parents are unable or unwilling to meet their parental responsibilities.  *Id.*

Before terminating a parent's parental rights, the State is required to allege and prove the following by clear and convincing evidence:

> (B) that one (1) of the following is true:
>
> > (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied;
> >
> > (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> *     *     *
>
> (C)  that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

INDIANA CODE § 31-35-2-4(b)(2).  If the trial court finds that the State's allegations in its petition to terminate parental rights are true, the court must enter written findings of fact supporting conclusions.  I.C. § 31-35-2-8(c).

When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review.  *In re A.S.*, 905 N.E.2d 47, 49 (Ind. Ct. App. 2009).  First, we determine whether the evidence supports the findings, and then we determine whether the findings support the judgment.  *Id.*  In doing so, we do not reweigh the evidence or judge witness credibility.  *Id.*  We consider only the evidence and reasonable inferences that are most favorable to the judgment.  *Id.*  If the evidence and

11

inferences support the trial court's decision, we must affirm. *In re J.S.*, 906 N.E.2d 226, 231 (Ind. Ct. App. 2009). We will set aside a judgment only when it is clearly erroneous. *In re A.S.*, 905 N.E.2d at 49. A judgment is clearly erroneous when the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

1. Findings of Fact

Because the judgment underlying the termination of the parents' parental rights contains specific findings of fact and conclusions thereon, we must first determine whether the evidence supports the findings. *See id.* If the record contains no evidence to support the findings either indirectly or by inference, the findings are clearly erroneous. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). Mother challenges the following findings of fact:

> 13. It took the parents nearly a year before they initiated the services they were court[-]ordered to participate in.
>
> \*       \*       \*
>
> 29. At the time of this hearing, neither parent has appropriate housing.
>
> \*       \*       \*
>
> 39. On the last meeting, Mother indicated a desire to hurt herself, and that she was going to self-report to a mental health facility. [6]

(Mother's Br. 26-28). Her arguments against these findings are that: less than a year passed before they initiated services; she had appropriate housing because she testified

---

[6] Father does not specifically dispute any of the trial court's findings. Instead, he argues that the findings do not support the conclusions thereon. In addition to the above findings, Mother also disputes finding number 26, which stated "[the p]arents have had many different residences since the onset of this case." (Mother's Br. 27) (quoting App. 26). However, we will address this finding later, because Mother's argument concerns whether the finding may support the trial court's conclusions of law. She does not dispute the evidence supporting the finding.

12

that she was living in her mother's house, and DCS never proved that this housing was inappropriate; and she never stated she was going to self-report to a mental health facility. We agree with Mother that the record does not contain evidence to support the above findings.

First, with respect to finding number thirteen, the parents completed some court-ordered services shortly after being ordered to do so. The trial court entered its dispositional decree ordering services on September 29, 2011. By November 16, 2011, both parents had completed substance abuse evaluations, and by the following March they had completed additional substance abuse evaluations. They also completed the Homebuilders parenting program on November 18, 2011. Less than a year after the trial court entered its dispositional decree, the parents were allowed a trial home visit because they were compliant with their services. Accordingly, the evidence shows that the parents did not take a year to begin their court-ordered services, contrary to the trial court's finding.

With respect to finding number twenty-nine, Mother testified that she was living with her mother in her mother's two-bedroom house at the time of the hearing. DCS did not present any evidence indicating that this housing was inappropriate. To the contrary, we have previously noted that living with extended family in the house can provide a child with a "safety net." *Tipton v. Marion Cnty. Dep't of Public Welfare*, 629 N.E.2d 1262, 1268 (Ind. Ct. App. 1994). The evidence therefore does not support the trial court's finding. Notably, we also find it significant that although the trial court's finding was technically accurate in Father's case as he was incarcerated at the time of the

hearing, he was scheduled to be released within three days and testified that he planned to live in his father's house after his release. Father had lived in his father's house at another point during the CHINS and termination proceedings, and Landis noted that when he lived there, she "didn't [see] any housing needs." (Tr. 157). We interpret this testimony as evidence that Landis considered Father's father's house appropriate for the children.

Finally, with respect to finding number thirty-nine, it is not clear what the trial court meant by "[o]n the last meeting." (Mother's Br. 28). However, Mother testified at the termination hearing that, even though she thought that she needed inpatient treatment, she did not intend to self-report to a mental health facility because she was worried that DCS would use that as a reason to keep her children from her. Accordingly, we agree with Mother that she never told the trial court she intended to self-report.[7]

2. Conclusions of Law

Having found that three of the trial court's findings of fact were clearly erroneous, we must now determine whether there were nevertheless sufficient findings of fact to support the trial court's conclusions thereon. Mother and Father argue that there was not sufficient evidence to prove several of the conditions necessary to terminate their parental rights—(1) that there was a reasonable probability that the conditions that resulted in the children's removal from the parents' home would not be remedied; (2) that there was a reasonable probability that the continuation of the parent-child relationship would pose a

_____

[7] The trial court noted Mother's failure to report in finding number forty, which states "Mother never reported." (Mother's Br. 28).

14

threat to the children; (3) that termination was in the children's best interests; and (4) that DCS had a satisfactory plan for the care and treatment of the children.

As stated above, DCS must prove "each and every element" of the termination statute by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009), *reh'g denied*. As a standard of proof, clear and convincing evidence requires the existence of a fact to "'be highly probable.'" *In re D.W.*, 969 N.E.2d 89, 94 (Ind. Ct. App. 2012) (quoting *Hardy v. Hardy*, 910 N.E.2d 851, 859 (Ind. Ct. App. 2009)). "It need not reveal that 'the continued custody of the parent[] is wholly inadequate for the children's very survival.'" *Id.* (quoting *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1233 (Ind. 1992)). Rather, it is sufficient to show that the children's emotional and physical development are threatened by the parent's custody. *Id.*

A.  *Conditions Remedied*

When determining whether the conditions that led to a child's removal will not be remedied, the trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing. *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). However, the trial court must also evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. *Id.*

Mother argues that the trial court's findings do not support its conclusion that the conditions that led to the removal of the children would not be remedied. Specifically, she notes that the conditions that led to the children's removal were: (1) M.R.'s death from ingesting prescription medication; (2) the parents' lack of suitable housing; and (3) the parents' drug use. She claims that there were no findings indicating that access to

15

prescription medication is still an issue, because the parents obtained a small, locked safe to hold their prescription medication. She also notes that, as we have found, the trial court's finding stating that the parents do not have adequate housing was an error; and there is no evidence that the parents have engaged in habitual, ongoing drug use.

Father also disputes the trial court's conclusion that the conditions that led to the removal of the children would not be remedied. He claims that he will have proper housing when he is released from incarceration, has his own handyman business, and has an additional potential offer of employment. He also argues that, even though he did occasionally test positive for drugs, he did not have a positive drug screen for the eight months prior to the termination hearing. In addition, he contends that although he did not complete services during the termination proceedings, he participated in a substantial number of services. As evidence of his potential, he notes that his counselor, Taggart, testified that he would give Father another chance if it were his decision. Similarly, many of the service providers testified that the parents had good parenting skills.

Although it is apparent from the record that the parents love their children, have parenting skills, and have made some progress in their services, we cannot find that the trial court's conclusion was clearly erroneous. The trial court must evaluate a parent's fitness at the time of the termination hearing, and at the time of the parents' termination hearing, they had failed to complete any services after the children were removed from their home as a result of drug use during the trial home visit. While Mother remedied two of the conditions that led to the children's removal, there was no evidence that she would remedy her substance abuse. To the contrary, her substance abuse worsened when

16

DCS returned her children for the trial home visit. After that point, she failed to complete any substance abuse treatment. Aspire required Mother to complete two substance abuse evaluations because she did not follow up with Aspire after her first. Then, after her second evaluation, she attended only four meetings of group and individual therapy in the months before the termination hearing. At the hearing, Taggart testified that he considered the chances "pretty slim" that Mother would seek treatment. (Tr. 133).

As for Father, although he did not abuse drugs in the eight months preceding the termination proceedings, he also failed to complete his substance abuse treatment, and he turned to drug abuse when the children were placed with him for the trial home visits. Even though he attended a month of treatment at Aspire, he failed to attend the last eight weeks of his program, which caused Aspire to discharge him for non-attendance. After that point, he never contacted the family case manager about continuing treatment elsewhere.

In light of the parents' failures to complete treatment for their substance abuse, we agree with the trial court's conclusion that there was a reasonable probability that the conditions that led to the children's removal would not be remedied. Because the requirements of INDIANA CODE § 31-35-2-4(b)(2)(B) are written in the disjunctive, DCS only needed to prove one of the three elements under subparagraph (B). Therefore, we need not also address the trial court's conclusion that the continuation of the parents' relationship with the children would pose a threat to their well-being. *B.H. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 355, 364 (Ind. Ct. App. 2013) (noting that subparagraph (B) is written in the disjunctive).

17

B. *Best Interests*

Next, we must address whether the termination of the parents' parental rights was in the children's best interests. In determining the best interests of a child, the trial court is required to look beyond the factors identified by DCS and to consider the totality of the evidence. *In re J.S.*, 906 N.E.2d at 236. In doing so, "the trial court must subordinate the interests of the parent to those of the child." *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013), *reh'g denied*. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* Recommendations of the case manager and court-appointed advocate, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id.*

Both parents argue on appeal that the only evidence DCS presented that termination was in the children's best interests was that the children needed stability and permanency. The parents cite to our previous opinion in *Rowlette v. Vanderburg Cnty. Office of Family and Children*, 841 N.E.2d 615 (Ind. Ct. App. 2006), *trans. denied*, where we held that permanency, in and of itself, is not a valid basis for terminating the relationship between the natural parents and their children. Mother also notes that assessments of their parenting skills have consistently had positive results and that they have never missed a visit with the children. She cites several progress reports stating that she made significant progress in complying with her services. She claims that the termination order focuses on her past failures without addressing the progress she has made.

18

While we agree with the parents that a need for permanency, alone, is not a sufficient basis for terminating parental rights, it was not the only basis here. Mother argues that the trial court judged her on her past failures, but the opposite is actually true. All of the progress reports Mother mentions were written before the children's trial home visit. It is undisputed that at that point in the CHINS proceedings, the parents were sufficiently complying with the trial court's dispositional order. It was after the trial home visit that the parents discontinued, and failed to complete, their services. Since the trial home visit, the parents have failed to demonstrate that they will remedy the conditions that led to the children's removal—their substance abuse. Moreover, the seriousness of their substance abuse has increased over time. Initially, the parents tested positive for marijuana and abused prescription drugs. Then, during their trial home visit, the parents tested positive for amphetamines and cocaine.

While a need for permanency alone is not sufficient to support termination, multiple service providers—including the family's DCS family case manager, the children's CASA, Taggart, Landis, and the children's therapist—testified that termination was in the children's best interests. In addition to permanency, the family case manager noted that the children had been removed from the parents' home for over two years, and the parents still had not completed their services. The CASA also found it determinative that the parents still struggled with substance abuse. Because we have previously held that recommendations of the case manager and court-appointed advocate, in addition to evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination of parental rights is in a child's

19

best interests, we must conclude here that the trial court did not err in its determination. *See In re J.C.*, 994 N.E.2d at 290.

C. *DCS's Plan for the Children*

Finally, Mother argues that DCS did not have a satisfactory plan for the children's care and treatment. DCS's plan for the children was for their aunt, T.E. ("Aunt"), and her husband to adopt them. Mother argues that this plan is unsatisfactory because Aunt did not want anything to do with the children unless the parents' parental rights were terminated. Mother also notes that DCS terminated Aunt's visitation with the children because she violated a condition of her visitation by discussing the case, the parents, and M.R.'s death with them. Father also disputes the adoption plan, claiming that it is unsatisfactory because there is no guarantee that the adoption will take place or that the children will stay together.

In *In re J.C.*, 994 N.E.2d at 290, the mother argued that DCS's plan for the care and treatment of her children following the termination of her rights was not satisfactory because DCS planned for the paternal grandmother, who had allowed the children to visit the father in prison, to adopt the children. On appeal, we upheld the trial court's finding that the plan was satisfactory based on the reasoning that the termination statute does not require the trial court to find that DCS's plan is in the child's *best* interests. *See id.*

Instead, Indiana courts have traditionally held that for a plan to be "'satisfactory,'" for the purposes of the termination statute, it "'need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated.'" *Lang v. Starke Cnty. Office of Family and Children*, 861

20

N.E.2d 366, 375 (Ind. Ct. App. 2007), *trans. denied.* A DCS plan is satisfactory if the plan is to attempt to find suitable parents to adopt the children. *Id.* In other words, there need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent. *See id.* Accordingly, a plan is not unsatisfactory if DCS has not identified a specific family to adopt the children. *Id.* Part of the reason for this is that it is within the authority of the adoption court, not the termination court, to determine whether an adoptive placement is appropriate. *See In re D.J.*, 755 N.E.2d 679, 685 (Ind. Ct. App. 2001), *trans. denied.* In *In re D.J.*, we noted, in response to a mother's concerns about a foster family's adoption of her children following the termination of her rights, that "[I]f the foster family desires to adopt the children, the home will have to be approved as an appropriate and suitable environment for the children." *Id.*

Based on these standards, we conclude that it was satisfactory here that DCS's plan for the children was adoption. We need not address whether Aunt is a suitable adoptive parent, because that is within the jurisdiction of the adoption court. *See In re M.B.*, 921 N.E.2d 494 (Ind. 2009). Likewise, in response to Father's argument, we have previously held that a plan is satisfactory, even if the plan is for the children to have separate adoptive homes. *A.J. v. Marion Cnty. Office of Family and Children*, 881 N.E.2d 706, 719 (Ind. Ct. App. 2008), *trans. denied.* Accordingly, we conclude that the trial court did not err in determining that DCS's plan for the children's care and treatment was satisfactory.

Affirmed.

FRIEDLANDER, J., and MATHIAS, J., concur.