## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Mar 26 2015, 10:16 am

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Mark I. Cox | Gregory F. Zoeller |
| The Mark I. Cox Law Office, LLC | Attorney General of Indiana |
| Richmond, Indiana | |
| | Robert J. Henke |
| | James D. Boyer |
| | Deputy Attorney Generals |
| | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of C.S. (Minor Child); | March 26, 2015 |
| | Court of Appeals Case No. 68A05-1407-JT-329 |
| J.S. (Mother), | |
| *Appellant-Respondent,* | Appeal from the Randolph Circuit Court |
| v. | Lower Court Cause No. 68C01-1305-JT-61 |
| The Indiana Department of Child Services, | The Honorable Jay L. Toney, Judge |
| *Appellee-Petitioner.* | |

**Pyle, Judge.**

# Case Summary

[1] J.S. ("Mother") appeals the trial court's termination of her parental rights to her minor son, C.S. C.S. was adjudicated a child in need of services ("CHINS") after Mother: had a physical altercation with her mother ("Grandmother") and father ("Grandfather") in front of C.S.; admitted that the home conditions were unsafe for C.S.; and admitted that he needed medical treatment that she had failed to provide. Then, Mother failed for two years to complete the services ordered by the trial court, and her parental rights were terminated. At the time of the termination hearing, the Indiana Department of Child Services' ("DCS") plan for C.S. was adoption.

[2] On appeal, Mother argues that the DCS did not present sufficient evidence that it had a satisfactory plan for C.S.'s care and treatment. She argues that, instead of a plan of adoption, DCS should have placed C.S. with one of her family members. We conclude that DCS appropriately considered C.S.'s placement and presented sufficient evidence that its plan of adoption was satisfactory.

We affirm.

# Issue

[3] Whether DCS presented sufficient evidence that it had a satisfactory plan for C.S.'s care and treatment prior to terminating Mother's parental rights to C.S.[1]

---

[1] C.S.'s biological father ("Father") voluntarily terminated his parental rights on September 12, 2013. He is not a party to this appeal.

## Facts

C.S. was born on December 18, 2006. In March 2012, when C.S. was five years old, Mother, C.S., and his siblings lived with Mother's parents ("Grandparents"). On March 22 that year, Mother had a physical altercation with Grandparents, which resulted in her arrest and incarceration in the Randolph County Jail.

At the time of her arrest, DCS learned that C.S. and his siblings "had bug bites over large areas of their bodies and all had ear infections." (State's Ex. 2 at 3). In addition, one of C.S.'s siblings had asthma-related issues, for which Mother had not sought medical treatment. Citing these facts and Mother's domestic abuse charges, DCS removed C.S. and his siblings from Mother's care and filed a petition alleging that C.S. was a CHINS.[2]

On June 28, 2012, C.S. was adjudicated a CHINS based on Mother's admission that: (1) on or about March 22, 2012, Mother was arrested and incarcerated for domestic violence in the presence of children;[3] (2) home conditions were unsafe for the children; (3) C.S.'s sibling had asthma and had to be admitted to the

---

[2] Although the trial court's order authorizing the petition is a part of the record, the CHINS petition itself is not. Also, it is apparent that DCS filed separate petitions for C.S.'s siblings.

[3] It is not clear how long Mother was incarcerated. However, her family case manager with DCS testified that she was jailed for "a second time at the end of March"—presumably in 2012, although that was not expressly stated—and "between May and July [2012]." (Tr. 63).

hospital; and (4) C.S. had bug bites over large areas of his body and an ear infection.

[7] Subsequently, the trial court held a dispositional hearing. It issued a dispositional order on September 4, 2012, requiring Mother to complete services, including substance abuse treatment and therapy. The trial court also ordered Mother to obtain employment and housing; submit to random drug screens; refrain from using illegal drugs; and engage in supervised visitation with C.S. Initially, DCS placed C.S. in foster care. However, when C.S. was leaving his first foster home, he requested that DCS place him with a family that he knew from church, and DCS did so.

[8] After C.S. was adjudicated a CHINS, an outpatient therapist, Jessica Hamlyn ("Hamlyn"), provided counseling for him. She diagnosed him with "Adjustment Disorder with a mixed disturbance of emotions and conduct." (Tr. 33). Hamlyn later testified that this disorder meant that C.S. struggled with transitions in his life and "act[ed] out" when he had significant transitions. (Tr. 33). However, Hamlyn noted that C.S. progressed through counseling. Initially, she met with C.S. weekly, but after C.S. was placed with the family he knew from church, he started doing well and advanced to the point that she only had to meet with him twice in six months.

[9] Throughout the CHINS proceedings, Mother failed to complete her required services, failed to consistently attend scheduled visitation, and failed to obtain employment or housing. She lived with Grandparents at times, but

Grandmother "never [knew] where [she was]." (Tr. 87). As a result of these factors, on May 23, 2013, DCS filed a petition to terminate Mother's parental relationship with C.S. At the time, DCS's plan for C.S.'s future care and treatment was adoption.

[10] On December 10, 2013, the trial court held a fact-finding hearing on the termination petition. At the hearing, the court heard testimony from multiple service providers regarding Mother's failure to complete services. The trial court also heard testimony regarding C.S.'s relationship with his family. Hamlyn testified that during her therapy sessions with C.S., he had asked about his siblings and grandparents. However, she stated that "[g]enerally, when he talks about his grandparents, it's because I've brought them up." (Tr. 37). She also noted that C.S. missed his brother but "was a little scared of him as well." (Tr. 37).

[11] Subsequently, Mother's DCS Family Case Manager, Linda Marsh ("FCM Marsh"), testified regarding DCS's attempts to place C.S. with his family prior to forming its plan for adoption. She stated that DCS had first considered placing C.S. with Father, but Father had decided not to take him. She also explained that DCS had considered Mother's siblings, but her sister's residential restrictions had prevented her from housing more children, and Mother's brother had never responded to any of FCM Marsh's messages. Finally, FCM Marsh testified that DCS had not considered Grandparents for placement because Mother had struggled with addiction issues when she resided with Grandparents; "[a] lot of the trauma that was described by the children was

while [in Grandparents'] care;" Grandparents had contributed to the conditions that led to C.S.'s removal, and "there was domestic violence in the home." (Tr. 74). As a result, "at that particular point in time, [FCM Marsh] did not believe it to be an appropriate placement [or] safe place for the children." (Tr. 74-75).

[12] Subsequently, on June 30, 2014, the court entered an order terminating Mother's parental rights. Mother now appeals.

## Decision

[13] On appeal, Mother argues that DCS did not present sufficient evidence that there was a "satisfactory plan for the care and treatment of" C.S. as required by INDIANA CODE § 31-35-2-4(b)(2)(D). Specifically, she asserts that DCS did not produce any witnesses from an adoptive home to testify that they were willing to adopt C.S. or any evidence that the adoption would take place within a certain timeframe. She also argues that DCS's plan was unsatisfactory because DCS was supposed to prioritize placing C.S. with relatives before adoption. Notably, Mother does not dispute any of the trial court's other findings or conclusions that supported the termination of her parental rights, so we will not address them here.

[14] Under INDIANA CODE § 31-35-2-4(b)(2)(D), prior to terminating parental rights, DCS must prove by clear and convincing evidence that "there is a satisfactory plan for the care and treatment of the child." Indiana courts have traditionally held that for a plan to be "'satisfactory'" for the purposes of the termination, it "'need not be detailed, so long as it offers a general sense of the direction in

which the child will be going after the parent-child relationship is terminated.'" *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014) (quoting *Lang v. Starke Cnty. Office of Family and Children*, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007), *trans. denied*), *trans. denied.* A DCS plan is satisfactory if the plan is to attempt to find suitable parents to adopt the child. *Id.* There need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent. *Id.* Accordingly, a plan is not unsatisfactory if DCS has not identified a specific family to adopt the child. *Id.* Part of the reason for this is that it is within the authority of the adoption court, not the termination court, to determine whether an adoptive placement is appropriate. *Id.*

[15] Based on this standard, we conclude that DCS was not required to produce witnesses from an adoptive home or to establish when the adoption would take place. It was sufficient that DCS stated that its plan was to attempt to find adoptive parents for C.S. *See id.*

[16] As for Mother's second argument, she cites to INDIANA CODE § 31-34-4-2, which states that

> (a) if *a child alleged to be a child in need of services* is taken into custody under an order of the court under this chapter and the court orders out-of-home placement, the department is responsible for that placement and must care and must consider placing the child with a:
>> (1) suitable and willing relative; or
>> (2) de facto custodian;
>> before considering any other out-of-home placement.

(emphasis added). She claims under this provision, DCS was required to consider placing C.S. with one of her family members, rather than placing him outside of the home through adoption.

[17] We addressed a similar argument in *In re B.M.*, 913 N.E.2d 1283, 1287 (Ind. Ct. App. 2009), with respect to INDIANA CODE § 31-34-6-2, which concerns the detention of a child alleged to be a CHINS. That provision provides that: "A juvenile court or the department shall consider placing a *child alleged to be in need of services* with an appropriate family member of the child before considering any other placement for the child." I.C. § 31-34-6-2 (emphasis added). Both INDIANA CODE § 31-34-4-2, which Mother cites to, and INDIANA CODE § 31-34-6-2, which we discussed in *B.M.*, are within Article 34 of the Indiana Code, which is titled "Juvenile Law: Children in Need of Services" and applies to CHINS.

[18] In *B.M.*, a Father tried to argue that the trial court was required to consider placing B.M. with his sister before terminating his parental rights. 913 N.E.2d at 1287. We held that section 31-34-6-2, to which he cited, applied to CHINS proceedings, not termination proceedings. *Id.*

[19] For the same reason, we are not persuaded by Mother's argument here. Like INDIANA CODE § 31-34-6-2, INDIANA CODE § 31-34-4-2 concerns the placement of CHINS and is not relevant to a termination proceeding. *See Hite v. Vanderburgh Cnty. Office of Family and Children*, 845 N.E.2d 175, 182 (Ind. Ct. App. 2006) ("CHINS proceedings are separate and distinct from involuntary

termination proceedings because a CHINS cause of action does not necessarily lead to an involuntary termination cause of action.")  Mother has not directed us to any other legal authority for her proposition that DCS was required to consider placing C.S. with her family before adoption.  Moreover, we note that, as FCM Marsh testified at trial, DCS did initially consider Mother's family members and found them unsatisfactory for placement for various reasons.  Accordingly, as Mother has not otherwise challenged DCS's plan of adoption, we conclude that plan was satisfactory.

Affirmed.

Barnes, J., and May, J., concur.