## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 14 2019, 9:27 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of:<br><br>J.F., S.S., E.S. & G.S. (Minor Children)<br><br>and<br><br>C.S. (Mother),<br><br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana Department of Child Services,<br><br>*Appellee-Petitioner* | August 14, 2019<br><br>Court of Appeals Case No. 19A-JT-492<br><br>Appeal from the Vigo Circuit Court<br><br>The Honorable Sarah K. Mullican, Judge<br><br>The Honorable Daniel W. Kelly, Magistrate<br><br>Trial Court Cause Nos. 84C01-1805-JT-537, 84C01-1805-JT-538, 84C01-1805-JT-539, 84C01-1805-JT-540 |

**Altice, Judge.**

## Case Summary

[1] C.S. (Mother) appeals from the involuntary termination of her parental rights

[2] to four of her minor children, J.F., S.S., E.S., and G.S. (collectively, the Children).[1] Her sole argument on appeal is that the Indiana Department of Child Services (DCS) failed to present sufficient evidence to support the trial court's conclusion that DCS had a satisfactory plan for the care and treatment of the Children following termination.

[3] We affirm.

## Facts & Procedural History

[4] Four of Mother's children are the subjects of these termination proceedings: J.F. (born in March 2004), S.S. (born in May 2006), E.S. (born in February 2008), and G.S. (born in May 2012).[2] The Children were adjudicated to be CHINS in October 2016, and they were all removed from Mother's care by the end of 2016 due to ongoing neglect. Following a permanency hearing, an order was issued in March 2018 in the CHINS proceedings approving of a change in the permanency plan from reunification to termination of parental rights and

---

[1] The father of S.S., E.S., and G.S. is deceased. The father of J.F. voluntarily terminated his parental rights.

[2] Mother has another minor child, J.S. (born in February 2014), who was adjudicated a CHINS along with his siblings. Termination proceedings regarding J.S. were being held separately for reasons not clear in the record.

adoption. DCS filed petitions to involuntarily terminate Mother's parental rights as to each of the Children in June 2018. The termination factfinding hearing was held September 17, 2018 and December 4, 2018. On December 6, 2018, the trial court issued orders terminating Mother's parental rights to each of the Children. Mother now appeals. Additional information will be provided below as needed.

## Discussion & Decision

We begin by setting out the bulk of the findings and conclusions made by the trial court in the termination orders:[3]

> g. There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied and that the continuation of the parent-child relationship poses a threat to the well-being of the child as set forth below.
>
> > 1. On August 8, 2016, DCS received a report that law enforcement was requesting immediate assistance as there was an altercation between [Mother] and [E.S.] in which [E.S.] was allegedly hit in the face with a stick and the home conditions were well below minimum sufficient standards. The FCM observed five children in the home. [E.S.] had a red mark near her eye…. S.S. had a small bruise on her leg that she claimed was caused by Mother …. The FCM observed clothes, trash and food covering the entire house, as cockroaches were all over the floors

---

[3] Termination orders, which were virtually identical, were entered individually for each of the Children.

and walls.  Mother refused a request that she submit to a drug screen.

2. Mother had prior DCS history, including a substantiation for neglect in 2012, a substantiation for physical abuse in January, 2014, and a substantiation for neglect in May, 2014.  The children were removed on two prior occasions and returned to her care in February, 2016, just six months prior to the opening of this case.

3. Mother admitted to having substance abuse issues since she was 13 years old.  She is now 36 years old.

4. Mother also admitted to suffering from depression and anxiety and that she uses drugs, especially marijuana and K-2, to deal with depression….

5. Jade Carlson of DCS testified that her department had eleven (11) reports of abuse and/or neglect against [Mother] between August and November, 2016.  During one assessment, one of the children retrieved a pipe allegedly used for smoking K-2 from Mother's purse and gave it to the case worker.

6. DCS opened an In-Home CHINS on August 30, 2016, but had to remove the children on or about November 10, 2016.  The motion to modify the dispositional decree stated:

"Mother has tested positive for "K-2," her significant other who lives in the home has tested positive for "K-2," the children and service providers have observed inappropriate individuals coming in and out of the home, the children have expressed that they have seen Mother use drugs,

there are ongoing concerns of physical discipline and burns on the children that allegedly came from Mother's "K-2" pipe. Mother has not utilized the services being offered to her and there are ongoing concerns with the home conditions."

7. The 1st family team meeting was held in the home and the kids were running around chaotically. [J.F.] had recently been arrested for a couple of arsons and was sent to Wernle by probation on October 31, 2016 for a diagnostic evaluation. Upon his release from Wernle in December of 2016, [J.F.] was placed in foster care.

8. All of the children had emotional and behavioral issues and were ordered into services.

**** 

10. At various times throughout the CHINS proceedings, Mother was in compliance with each requirement, but she was never in compliance with all requirements simultaneously. She ultimately became non-compliant with everything except her supervised visits. She often failed to attend her services and to implement what was taught. She accomplished none of the goals of case management.

11. …. The only drug treatment [Mother] completed was from December, 2016, until April of 2017 when she was closed out of services. During the DCS involvement, she completed approximately 78 of 191 drug screens requested …. She tested positive 17 times, with results coming back for K-2, marijuana, alcohol, barbiturates, amphetamine and methamphetamine….

12. During supervised visits, Mother was unable to control the children and had seizures during visits which left her confused and combative and were traumatic for the children….

13. The supervised visits with their mother was [sic] observed by supervisors to cause stress to the children. Due to their older ages, [S.S.] and [J.F.] were eventually allowed to decide whether or not to visit. [S.S.] stopped visiting in early 2017, while [J.F.] stopped visiting in the spring of 2018.

****

16. After DCS's involvement over two CHINS cases for most of the past six years, except for the six-month period between February and August, 2016, Mother still lacks stable housing and employment, has failed to achieve and maintain sobriety, is unable to meet her own and her children's basic needs and to provide consistency for the children.

17. Mother also has significant health issues related to her seizures. DCS tried repeatedly to persuade Mother to see a physician for her seizures, which were suspected to be related to her chronic use of K-2, but she refused….

18. Although the older two children stopped visiting with Mother of their own accord, the two younger children were continuing to have supervised visits.

19. The visitation supervisor described very disturbing incidents that occurred [on November 17, 2018]. [S.S.] and [E.S.] left the visit room and went into another part of

the building.  Mother cautioned them not to mess up her visit.  The girls ultimately left the property where the visit was occurring (Lifeline Youth and Family Services).  The police were called and the CASA found the girls and picked them up and returned them to the site of the supervised visit.  Mother and the two girls then became engaged in a screaming match.  [Mother] grabbed a blanket from 10-year-old [E.S.] and threw it in the street.  Mother herself then jumped into the street in front of the kids and tried to get herself hit by a car.  [G.S], age 6, became very upset and was crying.  The behavior of both [E.S.] and [G.S.] deteriorated at the scene.  [E.S.] threw a coke bottle at a car and threw nails at the visitation supervisor; she tried to drag a can of paint off of the porch; and threw a soiled diaper at the visitation supervisor.  [Mother] was screaming at the foster mother for picking up and attempting to comfort [G.S.], and yelled at her, saying to "quit crying like a f**king baby."  After this last visit, CASA filed a motion to stop supervised visits which was granted.

20. The children have had numerous, serious problems, including arrests and probation and have been housed in residential and psychiatric facilities and foster homes and continue to present numerous behavioral issues, presumably due at least in part to their upbringing.

h. Termination is in the best interests of the minor child as testified to by DCS and CASA.  [J.F.] gave compelling testimony regarding termination of parental rights being in the best interest of himself and his siblings.  He explained that he had been removed multiple times by DCS and that, although his mother would assure him that things had changed, they never did.  She was rarely employed and he often saw her smoking from a pipe and believes it was K-2 ….  He said that even when DCS was not involved he spent a lot of time at friends' homes because of the

infestation of bugs in his own home and a constant lack of food. … He also described the home as being frequented by strangers who appeared high or drunk. He does not want his younger siblings to continue to endure what he has.

i. [DCS] has a satisfactory plan for the care and treatment of the child, which is adoption.

*Appellant's Appendix Vol. 2* at 58-63, 99-104, 134-39, 164-69.

[6] Of the above findings and conclusions, Mother challenges only the last sentence (subsection i) on appeal. In other words, she essentially concedes that termination is in the best interests of the Children, that their well-being is threatened by continuation of the parent-child relationship, and that there is a reasonable probability that the conditions resulting in their placement outside Mother's home will not be remedied.

[7] Mother contends that DCS failed to prove by clear and convincing evidence that there is a satisfactory plan for the care and treatment of the Children following termination. In this regard, she notes that the Children are in separate placements and only G.S. is in a pre-adoptive foster home.

[8] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by "clear and convincing evidence", among several other things, that "there is a satisfactory plan for the care and treatment of the child." Ind. Code § 31-37-14-2; Ind. Code § 31-35-2-4(b)(2)(D). It is well established that "[t]his plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child

relationship is terminated." *A.J. v. Marion Cty. Office of Family & Children*, 881 N.E.2d 706, 719 (Ind. Ct. App. 2008), *trans. denied*; *see also In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied*; *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007), *trans. denied*.

> A DCS plan is satisfactory if the plan is to attempt to find suitable parents to adopt the children. In other words, there need not be a guarantee that a suitable adoption will take place, only that DCS will attempt to find a suitable adoptive parent. Accordingly, a plan is not unsatisfactory if DCS has not identified a specific family to adopt the children.

*In re A.S.*, 17 N.E.3d at 1007.

[9] In this case, DCS's plan for each of the Children is adoption. Evidence was presented that G.S. is in a pre-adoptive home with J.S. (the child not included in this appeal), and the foster mother testified that she was "[a]bsolutely" willing to adopt G.S. *Transcript* at 143. With respect to the other children, DCS family case manager Hayden Vidal testified in September 2018 that S.S.'s foster parents were considering whether to adopt her, J.F.'s placement was too recent to know whether it is pre-adoptive,[4] and E.S. was in a residential facility receiving therapy. Vidal explained that DCS is seeking pre-adoptive homes and that the plan is for the Children to be placed separately, as the Children do not wish to be placed together and have done better being in separate homes with

---

[4] J.F. testified that he wanted to stay in his current foster home and not live with Mother or his siblings.

weekly sibling visits. When the hearing resumed in December 2018, the CASA testified that S.S. had since lost her pre-adoptive placement due to her behavior, which declined following the postponement of the September hearing. The CASA urged the trial court to quickly terminate Mother's parental rights to allow the Children to be adopted into families and have permanency.

[10] Attempting to find suitable parents to adopt the Children is "clearly a satisfactory plan." *Lang*, 861 N.E.2d at 375. The fact that DCS did not have specific families in place to adopt each of the Children does not make the plan unsatisfactory. *Id.* Likewise, the plan is not unsatisfactory simply because it is for the Children to have separate adoptive homes. *See In re A.S.*, 17 N.E.3d at 1007; *A.J.*, 881 N.E.2d at 719. The trial court found that the plan for each child was adoption, which is supported by the evidence. Accordingly, the trial court did not err in determining that DCS's plan for the Children's care and treatment was satisfactory.

[11] Affirmed.

Brown, J. and Tavitas, J., concur.