## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 25 2018, 9:11 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Deidre L. Monroe
Gary, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of Parental Rights of:

F.J., C.O., J.O., & M.O., (Children),

and,

M.O., (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

May 25, 2018

Court of Appeals Case No.
17A-JT-3036

Appeal from the Lake Superior Court

The Honorable Thomas P. Stefaniak, Jr., Judge

Trial Court Cause No.
45D06-1512-JT-273
45D06-1512-JT-275
45D06-1512-JT-276
45D06-1703-JT-70



*Appellee-Petitioner.*

**Barnes, Judge.**

# Case Summary

[1]    Me.O. ("Mother") appeals the trial court's termination of her parental rights to her children, F.J., C.O., J.O., and M.O. ("Children"). We affirm.

# Issue

[2]    Mother raises one issue, which we restate as whether the evidence is sufficient to support the termination of her parental rights.

# Facts

[3]    Mother has five children: J.J., who was born in January 2000;[1] F.J., who was born in August 2003; J.O., who was born in July 2008; C.O., who was born in March 2011; and M.O., who was born during these proceedings in December

---

[1] J.J. is not involved in these termination proceedings because she was placed in another planned permanent living arrangement.

2014. L.C. is the father of J.J. and F.J., and B.O. ("Father") is the father of J.O., C.O., and M.O.[2]

[4] On June 27, 2013, Mother and the Children were moving from North Carolina to Illinois when Mother was stopped in Indiana for speeding in a work zone and weaving in and out of traffic. The officer discovered that Mother was impaired, she failed field sobriety tests, and blood testing revealed the presence of clonazepam, Tramadol, and marijuana in her system. Mother admitted to officers that she had taken clonazepam and Tramadol that morning, that she had taken Dexilant and Lamotrigine the night before, and that she had smoked marijuana or K2/spice the night before. Although Mother had been prescribed the Clonazepam, Tramadol, Dexilant and Lamotrigine, the side effects of the medications include dizziness and drowsiness. Mother was arrested and charged with four counts of operating a vehicle while intoxicated endangering a person with a passenger less than eighteen years of age, one count of operating a vehicle while intoxicated endangering a person, work zone speeding with workers present, and failure to signal for turn or lane change. She ultimately pled guilty and received probation, but she violated her probation and had to serve three months in jail.

[5] Because Mother was arrested and there was no one else to care for the Children, the Boone County Office of the Department of Child Services

---

[2] L.C.'s parental rights were also terminated, but he does not appeal. Father died during these proceedings.

("DCS") took the Children into custody. DCS discovered that Mother had a prior history with the Division of Social Services in North Carolina for marijuana use and the conditions of her home. The North Carolina Division of Social Services requested that DCS continue to care for the Children until a "UCCJA Conference could be held." Ex. Vol. I p. 23. DCS filed a petition alleging that the Children were children in need of services ("CHINS"). After a hearing, the trial court entered findings of fact and conclusions thereon determining that the Children were CHINS. The trial court ordered Mother in part to refrain from using illegal drugs, take prescription medications only as prescribed, engage in home-based counseling, maintain suitable housing and employment, complete a substance abuse assessment and follow all recommendations, submit to random drug screens, attend visitations with the Children, and refrain from committing any acts of domestic violence. Over the next year, Mother struggled to comply with the trial court's order. She frequently cancelled visitations, tested positive for hydrocodone, failed to complete psychiatric and psychological evaluations and a domestic violence assessment, failed to participate consistently with individual therapy, threatened service providers, and was homeless. According to Mother, she has previously been diagnosed with "bipolar, anxiety disorder, stress disorder, borderline personality disorder, axis 1, 2, and 3" and post-traumatic stress disorder. Tr. Vol. II p. 31.

[6] M.O. was born in December 2014 and remained in Mother's care. In mid-2015, Mother and Father were living in Gary, and visits with the Children

started increasing to unsupervised visits in their home and overnight weekend visits. During one of the weekend visits in September 2015, Father became intoxicated, and there was a domestic violence incident. When the police and DCS arrived at the house, Mother was "antagonizing" Father and "calling him names and yelling and cursing." *Id.* at 108. The Children were upset, crying, and trying to calm Mother down. Mother "appeared to be not on her medication," could not calm down, and could not parent the Children. *Id.* at 111. DCS took the four older children back to their foster home and removed M.O. from Mother's care at that time. The following day Mother was arrested for driving with a suspended license and was placed on house arrest. DCS then filed a petition alleging that M.O. was a CHINS, which the trial court granted.

[7] Mother tested positive for synthetic marijuana in December 2015, violated her probation as a result, and had to serve jail time. Mother was also evicted from her home at that time. Mother and Father were involved in another domestic violence incident in January 2016. In February 2016, DCS filed a motion to suspend visitation between Mother and the Children. DCS reported that Mother was incoherent at a supervised visitation and a therapy session and that visits were detrimental to C.O. and F.J. DCS requested that Mother be ordered to complete an in-patient detox program. Service providers were concerned that Mother was "doctor hopping," and she was attempting to refill prescriptions prior to the refill date. Ex. Vol. II p. 7. Visits with the older Children were suspended in March 2016.

[8]     In May 2016, Mother's drug screens indicated that she was not taking her prescription medications for her mental health issues. Mother also tested positive for barbiturates and benzodiazepines, for which she did not have a prescription, alcohol, and an opiate. DCS noted that Mother had a prescription for oxycodone but, during a pill count on May 19, 2016, Mother "only had 16 pills left out of 60 pills and she got the prescription filled on May 17, 2016." *Id.* at 74.

[9]     In June 2016, the trial court adopted a permanency plan that included independent living for J.J., termination of parental rights and adoption for F.J., C.O., and J.O., and reunification for M.O. Also in June 2016, Father overdosed and died in a possible suicide. Over the next few months, Mother continued to test positive for alcohol and opiates. She did not, however, test positive for her mental health medications. In October 2016, DCS noted that Mother had a prescription for clonazepam but had been taking the pills more often than directed by the prescription. In November 2016, Mother tested positive for marijuana, ethyl, and methamphetamine. She tested positive for hydrocodone without a prescription in December 2016. In January 2017, Mother's hair follicle tested positive for cocaine, her specimen was diluted in January and March 2017, and she tested positive for hydrocodone twice in March 2017 without a prescription. In August 2017, Mother tested positive for marijuana on multiple occasions, cocaine, and hydrocodone. The trial court authorized DCS to discontinue all services except for supervised visitation of M.O. and random drug screens.

[10] In December 2015, DCS filed a petition to terminate Mother's parental rights to F.J., J.O., and C.O. In March 2017, DCS filed a petition to terminate her parental rights to M.O. After an evidentiary hearing in November 2017, the trial court entered findings of fact and conclusions thereon granting DCS's petitions. Mother now appeals.

## Analysis

[11] Mother challenges the termination of her parental rights to the Children. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). "Indeed the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb County Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). We recognize, of course, that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities.'" *Id.* (quoting *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*).

[12] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *Id.* We consider only the evidence and

reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)). Here, the trial court entered findings of fact and conclusions thereon in granting DCS's petition to terminate Mother's parental rights. Such findings of fact and conclusions thereon are required by Indiana Code Section 31-39-2-8(c). When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[13] Indiana Code Section 31-35-2-8(a) provides that "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (B)    that one (1) of the following is true:
>
> > (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C)    that termination is in the best interests of the child; and

(D)    that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992).

### *I. Changed Conditions*

Mother challenges the trial court's finding of a reasonable probability that the conditions resulting in the Children's removal or the reasons for placement outside her home will not be remedied.[3] In making this determination, the trial

---

[3] Mother also briefly argues that the trial court's conclusion that the continuation of the parent-child relationship poses a threat to the well-being of the Children is clearly erroneous. Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive. Subsection (b)(2)(B)(iii), which concerns repeated CHINS adjudications, is inapplicable here. Consequently, DCS was required to demonstrate by clear and convincing evidence a reasonable probability that either: (1) the conditions that resulted in the Children's removal or the reasons for placement outside the home of the parents will not be remedied, or (2) the continuation of the parent-child relationship poses a threat to the well-being of the Children. The trial court found a reasonable probability that the conditions that resulted in the Children's removal and continued placement outside parents' home would not be remedied, and there is sufficient evidence in the record to support the trial court's conclusion. Thus, we need not determine whether there was a reasonable probability that the continuation of the parent-child relationship poses a threat to the Children's well-being. *See, e.g., Bester v. Lake County Office of Family & Children*, 839 N.E.2d 143, 148 n.5 (Ind. 2005); *In re T.F.*, 743 N.E.2d 766, 774 (Ind. Ct. App. 2001), *trans. denied*.

court must judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The trial court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.*

[15]     On this issue, the trial court found:

>    There is a reasonable probability that the conditions resulting in the removal of the children from [their] parents' home will not be remedied in that: The Department of Child Services became involved with this family in June of 2013 when the mother was traveling from North Carolina to Illinois and was arrested for a OWI with the children in the vehicle. There were several reports to the Lebanon Police Department stating that there was a van veering off the road and nearly striking other vehicles going Northbound on I-65. [Mother] was identified as the driver. [Mother] was arrested on the site for Operating a Vehicle While Intoxicated leaving no one to care for her children. The children were placed in foster care. [Mother] professes to not have been intoxicated and only pled guilty out of convenience. [Mother] indicated she was fleeing North Carolina to Illinois to get away from the domestic violence.
>
>    Parents were offered services pursuant to a case plan which included substance abuse assessments, parenting assessment, home based casework services, initial clinical assessments, random drug and alcohol screens, individual therapy, domestic violence therapy and supervised visitations.
>
>    Mother was placed on probation in her criminal matter and mother violated her probation by testing positive on her drug

screen. Mother was incarcerated due to the violation in late 2015.

The CHINS cases were transferred from Boone County to Lake County, Indiana in July of 2013.

Mother has a history with the Department of Child Services in her home State of North Carolina. There was an open CHINS case in the State of North Carolina at the time of Indiana's Department of Child Services' involvement. The CHINS case in North Carolina stemmed from domestic violence in the family's home between Mother and [L.C.]. North Carolina closed their CHINS cases when Indiana became involved.

Mother began a relationship with [Father] and eventually married [Father]. The domestic violence issue continued but now between mother and [Father]. Mother testified that the domestic violence occurred for many years.

Father of [C.O., J.O. and M.O.], [Father] is deceased. Mother found him dead from what sounds like an intentional drug overdose. Mother still struggles with the effects of that event today. This occurred mid June 2016.

* * * * *

Mother and [L.C. and Father] lacked stability in housing and employment. They were homeless for a period of time when these cases were initiated. Services were offered to the parents in efforts to obtain stability for the parents. The parents eventually did obtain housing and the children began participating in in-home supervised visits with the children. A transition plan was put into place for the reunification process to begin.

Mother had another child, [M.O.] who was born in December of 2014. Parents were participating in services and participating in the transition plan for the other children. The case plan seemed to go well at first with mother. In September of 2015, mother and [Father] had a domestic violence episode with the children present in the home on a weekend visitation. [Father] was highly intoxicated and became violent in the home. Father had busted out of the windows in their van and in the home. The children were removed from parental care and [M.O.] became a ward of the Department of Child Services. Mother was extremely irate some hour and forty minutes after the event occurred per DCS worker, Shavon Smith.

Mother has a long history of mental health issues. Mother has been diagnosed with bipolar, borderline personality disorder and PTSD. Mother was hospitalized in 2003 due to a nervous breakdown. Mother is on numerous medications for her mental health issues, but does not take her medications as prescribed. Mother refuses to take medications, and testified that she uses marijuana instead.

Mother's visitations stopped with [F.J., C.O., and J.O.] in February of 2016 when the mother would appear incoherent at the visits and would miss her visitations. The mother continued to test positive for cocaine and marijuana on her drug screens. Mother was ordered to enter an inpatient substance abuse treatment program. Mother did not enter any such program.

The family's situation degenerated even further when, in June of 2016, [Father] died of an overdose. Mother used the father's death as a catalyst and a reason for her continued drug use.

Although mother participated in therapy, mother could not conquer her substance abuse issues. Mother continued to test positive for alcohol and illegal drugs on her screens. Psychiatric

services were given to mother, but mother did not take her prescribed medications and self medicated with marijuana and alcohol. Mother was given medication management services, but mother either over medicated herself or did not take her medications. Mother was referred to attend A/A meetings for her alcohol use and N/A meetings for her narcotic usage. Mother did not attend neither. Mother participated in her therapy, but continued with her self medicating lifestyle.

Mother indicates that she is not a chronic user of marijuana, but testified in open court that she smokes marijuana every night. Mother continues with her struggles with substances and her struggles with housing stability. Mother currently does not have independent housing and resides with her family in the State of Illinois.

Mother continues with her substance abuse issues and continues to test positive on her drug screens. Mother admits to using marijuana, cocaine and methamphetamines. Mother has not been able to address her substance abuse issues. Mother would not enter a substance abuse program. Mother is unable to remain drug free. Mother is in complete denial of her drug problem and testified to same.

Mother's dangerous lifestyle is not conducive for children. Mother has a long history of domestic violence issues with her partners. Mother has a history of mental health issues and abusing or ignoring her medications. Mother continues with her illegal substance abuse. Mother has an alcohol problem which she has not addressed. Mother's unstable behaviors, housing, and complete lifestyle choices have not been remedied in the past four years despite all the services offered to mother. Mother continued to test positive on her drug screens throughout these cases. Mother has tested positive for marijuana and cocaine on her drug screens as early as July of this year. Mother has not addressed her substance abuse concern in the last four years and

it is unlikely that mother will obtain sobriety. Mother refuses to attend inpatient treatment and continues to struggle with her sobriety. Mother has recently moved to the State of Illinois and does not participate in any services any longer. Mother has missed visitations with her children due to her relocation to the State of Illinois. Mother does not take her mental health issues seriously, it is unlikely that she will be able to address her children's mental health issues.

Despite multiple attempts at reunification, the children remain outside of the parents' care. The children have never been placed in parental care or custody since their initial removal in 2013. The original allegations of neglect have not been remedied by the parents. Neither of the parents have demonstrated an ability to independently parent the children and provide necessary, care, support, and supervision. Even considering the mother's continued involvement in services, there is no basis for assuming she will complete the necessary services and find herself in a position to receive the children back into the home. For approximately four years, the parents failed to utilize the available services and make the necessary efforts to remedy the conditions which led to intervention by DCS and the Court.

All the children have special needs and require specialized care. [F.J. and C.O.] were diagnosed with ADHD. [J.O.] was diagnosed with autism. [M.O.] was also diagnosed with autism, mother is in denial of [M.O.'s] diagnosis.

Mother has limited capacity of the needs of her children. The children have witnessed years of trauma while in parental care and require stability and consistency in their lives. The children continue to require therapy and are suffering from PTSD from what they witnessed while they were in parental care. Mother has asked her children to lie about their past and what they have witnessed, even though mother knew her children suffered from PTSD and needed to overcome their traumas. During family

therapy sessions, the children would become upset with mother for mother not validating their emotions and not putting the needs of her children first. Mother would have to be redirected in her parenting style during the supervised visits with mother. The mother had to be redirected to keep her children safe. The children would sometimes get injured during the visits and mother would be unaware or unable to prevent such injuries. Mother is unable to validate the children's emotions and understand the children's feelings. Mother was inconsistent with nurturing her children. The children do not have a loving bond or relationship with their mother.

* * * * *

No parent is providing any emotional or financial support for the children. No parent has completed any case plan for reunification. No parent is in a position to properly parent these children. The children are in placement and are bonded and thriving.

Appellant's App. pp. 3-5.

[16] Mother argues that she currently has housing, has received significant therapy, has employment, is no longer involved in a domestic violence relationship, and fully participated in her case plan. She denies recent drug usage but admits to daily marijuana usage. She contends that DCS "never really attempted to reunite these children with their mother" and that the Children were not harmed in her care. Appellant's Br. p. 14. Despite reunification services dating back to 2013, Mother is still unable to parent to the Children. She continues to test positive for illegal substances and fails to take her mental health medications. At the termination hearing, Mother testified that she smokes

marijuana every night to help with stress. We acknowledge that she has secured housing and employment, but she fails to recognize the distress and harm that her instability has caused the Children. Despite years of services, Mother still has untreated substance abuse and mental health issues. The trial court's findings are not clearly erroneous.

## II. Best Interests

[17] Mother also challenges the trial court's finding that termination of her parental rights is in the Children's best interests. In determining what is in the best interests of a child, the trial court is required to look at the totality of the evidence. *D.D.*, 804 N.E.2d at 267. In doing so, the trial court must subordinate the interests of the parents to those of the child involved. *Id.*

[18] Mother argues that she is young enough to have other children and that the Children have a right to a relationship with further siblings. She also argues that she has a right to raise the Children and that the Children will "suffer when they realize that they will not have any further contact with their Mother." Appellant's Br. p. 15.

[19] The focus here is on the Children's best interests, not Mother's wishes. Despite years of services, Mother has failed to address her substance abuse and mental health issues. During family therapy, Mother had a pattern of "making it about her instead of [the Children's] concerns." Tr. Vol. II p. 120. Mother was unable to validate the Children's feelings and empathize with them. Mother would sometimes make progress in the therapy sessions but would regress and

was unable to maintain the progress. Angela Krumrie, therapist and program supervisor, testified that adoption was in the Children's best interests. Particularly for J.O. and M.O, who have autism, structure is "very important to their everyday life." *Id.* at 126. The family case manager testified that termination of parental rights was in the Children's best interests because they need stability, they are thriving in foster care, and they "definitely feel as if their mom still needs to get herself together." *Id.* at 142. The trial court's findings regarding the Children's best interests are not clearly erroneous.

### III. Satisfactory Plan

[20] Finally, Mother also challenges the trial court's finding that there is a satisfactory plan for the care and treatment of the Children. Indiana courts have held that for a plan to be "'satisfactory,'" for the purposes of the termination statute, it "'need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated.'" *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014) (quoting *Lang v. Starke Cnty. Office of Family and Children*, 861 N.E.2d 366, 375 (Ind. Ct. App. 2007), *trans. denied*), *trans. denied*.

[21] The trial court found:

> The children continue to reside in stable foster homes which have indicated both a willingness and ability to adopt these children. The children are placed in separate foster homes, but the sibling relationship continues to the foster parents being relatives to one another. The children have demonstrated significant improvements in their placements. There is a strong bond

between the children and the foster parents. DCS has identified a satisfactory plan for the long term care and treatment of the children. It would be detrimental to the best interests of the children to disrupt the stability of their current placements.

Appellant's App. Vol. II p. 5. The court then concluded: "The Indiana Department of Child Services has a satisfactory plan for the care and treatment of the children which is Adoption by the respective foster parents." *Id.* at 6. Mother argues that DCS has failed to prove it has a satisfactory plan because there was "no testimony by either foster parent that they would agree to adopt these children." Appellant's Br. p. 15. However, the DCS family case manager testified that the foster parents were "[w]illing and wanting to adopt the children." Tr. Vol. II p. 143. DCS was not required to present the testimony of specific foster parents regarding whether they are willing to adopt. DCS's general plan of adoption is satisfactory. The trial court's finding is not clearly erroneous.

# Conclusion

[22] The evidence is sufficient to support the termination of Mother's parental rights to the Children. We affirm.

[23] Affirmed.

Vaidik, C., J., and Pyle, J., concur.