## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 17 2018, 8:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT N.N. (FATHER)

Yvette M. LaPlante
Keating & LaPlante, LLP
Evansville, Indiana

ATTORNEYS FOR APPELLANT R.N. (MOTHER)

Steven E. Ripstra
Jacob P. Wahl
Ripstra Law Office
Jasper, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of D.S., et al. (Minor Children),

and

N.N. (Father) and R.N. (Mother),

*Appellants-Respondents,*

v.

October 17, 2018

Court of Appeals Case No. 18A-JT-809

Appeal from the Pike Circuit Court

The Honorable Jeffrey L. Biesterveld, Judge

The Honorable Joseph L. Verkamp, Referee

| The Indiana Department of Child Services, | Trial Court Cause Nos. |
| --- | --- |
| | 63C01-1703-JT-49 |
| *Appellee-Petitioner.* | 63C01-1703-JT-51 |
| | 63C01-1703-JT-52 |
| | 63C01-1703-JT-53 |
| | 63C01-1703-JT-54 |

**Bailey, Judge.**

# Case Summary

[1] R.N. ("Mother") had five children, four of them with N.N. ("Father"). Both Mother and Father appeal the termination of their respective parental rights, challenging the sufficiency of the evidence supporting termination.[1]

[2] We affirm.

# Facts and Procedural History

[3] Mother and Father were married and had four children together: J.N. (born 7/25/07), N.N. (born 1/26/09), Ai.N. (born 11/27/11), and Ar.N. (born 1/6/13) (collectively, the "Siblings"). Mother also had a prior-born child, D.S. (born 8/20/03). In May 2014, all five of the children (the "Children") were

---

[1] The father of the fifth child relinquished his parental rights and does not actively participate in this appeal.

residing with Mother and Father. On May 20, 2014, the Pike County Department of Child Services ("DCS") investigated a report that N.N.—who was five years old—was seen crossing a busy highway alone.

[4] DCS personnel visited Mother's and Father's residence, where they observed animal feces, broken glass, diapers, and food strewn about the home. DCS removed the Children and placed them in foster care. In the ensuing months, Mother and Father pleaded guilty to neglect of a dependent based upon the events underlying DCS's involvement, and each began serving a three-year sentence on work release. At some point, Mother and Father admitted that the Children were CHINS, which led to a CHINS adjudication in September 2014. Around that time, the criminal court entered an order prohibiting Father from contacting the Siblings.

[5] The trial court entered a dispositional decree in October 2014 ordering Mother and Father to, *inter alia*, maintain safe and suitable housing. By that point, the Siblings were living in the same foster home. Although D.S. initially was placed with his father, the father later relinquished his parental rights in early 2015. D.S. was then placed in the same foster home as the Siblings.

[6] On March 14, 2017, nearly three years after the Children had been removed, DCS petitioned to terminate Mother's and Father's respective parental rights. A fact-finding hearing was held in July and August 2017, by which point Mother and Father were no longer married. The court later terminated Mother's and Father's parental rights and entered findings and conclusions,

among them: "From the outset of the underlying CHINS causes, neither [Mother nor Father] was able to . . . maintain suitable housing . . . or provide for the children's basic needs." Mother's App. Vol. 2 at 74; Mother's Supp. App. Vol. 2 at 7.[2]

[7] Mother and Father now appeal.

# Discussion and Decision

[8] "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Our General Assembly has thus set a high bar for terminating parental rights." *In re Bi.B.*, 69 N.E.3d 464, 465 (Ind. 2017).

[9] Under Indiana Code Section 31-35-2-4(b)(2), a petition seeking to terminate the parent-child relationship must allege, in pertinent part:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree. . . .
>
> (B) that one (1) of the following is true:

---

[2] The trial court entered a termination order concerning the Siblings and a separate order concerning D.S. Where the orders are identical, we hereafter cite only to the order concerning the Siblings.

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child. . . .

> (C) that termination is in the best interests of the child; and

> (D) that there is a satisfactory plan for the care and treatment of the child.

[10] The petitioner must prove each element by clear and convincing evidence. Ind. Code § 31-37-14-2. If the court finds that the allegations are true, "the court shall terminate the parent-child relationship." I.C. § 31-35-2-8(a). In doing so, the court must enter findings and conclusions, irrespective of whether the parties have made a Trial Rule 52 request. *See* I.C. § 31-35-2-8(c); Ind. Trial Rule 52. We will not "set aside the findings or judgment unless clearly erroneous," T.R. 52(A); clear error is "that which leaves us with a definite and firm conviction that a mistake has been made," *Egly v. Blackford Cty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). In reviewing for clear error, we look to "whether the evidence supports the findings, and whether the findings support the judgment." *Steele-Giri v. Steele*, 51 N.E.3d 119, 123 (Ind. 2016). Moreover, we neither reweigh the evidence nor judge the credibility of witnesses, *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016), and we give "due

regard . . . to the opportunity of the trial court to judge the credibility of the witnesses," T.R. 52(A).

[11] Neither Mother nor Father dispute that the Children were outside of the home for the requisite time or that there was a plan in place for the Children to be adopted. Rather, they focus on challenging the sufficiency of the evidence as to other statutory requirements. We address those challenges in turn.

## Remedying of Conditions

[12] Mother and Father independently argue that there was insufficient evidence supporting the trial court's determination that there is a reasonable probability that the conditions that resulted in removal or placement outside the home would not be remedied. In this case, the Children were removed from the home due to issues with housing conditions and parental supervision.

[13] In ordering termination, the court found, and the evidence supports, that the Children had "been the subjects of multiple prior CHINS cases due to the parents' failure to maintain appropriate housing," and that after a case would close, Mother and Father maintained appropriate housing "for less than two (2) years before the children were once again removed due to deplorable home conditions and neglect." Mother's App. Vol. 2 at 74. The court characterized the repeated need for DCS involvement as a "failure" on both Mother's and Father's parts "to learn and improve their home conditions . . . evidenc[ing] a habitual pattern of conduct that is unlikely to be remedied." *Id.* at 75. The court also found that the eldest—D.S. and J.N.—had been removed four times,

and "were accustomed to the removal process and had no reaction" when removed. *Id.*

[14] The trial court further found that both Mother and Father had "blamed the other and DCS for the children being removed from their care," and that they "lacked insight into the reasons that brought about the removal of the children." *Id.* at 76-77. Indeed, at the fact-finding hearing, Mother admitted that the housing conditions at the time of the removal were "not the greatest" but would not answer whether, in her opinion, it was safe for the Children to reside there. Tr. Vol. II at 63. There was also evidence that, at one point, Mother told a psychologist that it was not her fault that N.N. had left the house because N.N. always climbed out of windows and there was no alarm system.

[15] As to Father, the court found that he "minimized the state of the home." Mother's App. Vol. 2 at 77. Father asserts that this characterization of his testimony "is a matter of opinion" and suggests that he was "between a rock and a hard place" because admitting that home conditions were poor "would have led to criticisms for failing to intervene and/or pinning all of the problems on Mother." Father's Br. at 19. Father also asserts that his "feelings about the cleanliness of the home the last time he was in the house, which was three days prior to the removal, are not particularly relevant to whether or not Father would be able to remedy the problem." *Id.* Yet, we may not reweigh evidence,

which indicates that the troubling conditions had not materialized overnight—and that this was not an isolated incident of failing to provide suitable housing.[3]

[16] Mother points out that she was incarcerated for much of the approximately three years the Children were outside of the home, and had only recently been released at the time of the final hearing. Mother suggests that she was progressing toward suitable housing. Yet, the trial court found—and the evidence supports—that "[d]espite fairly consistent employment over the course of the three years each parent was incarcerated on work release, neither had made plans or saved money to secure appropriate housing upon their release." *Id.* at 78. Indeed, there was evidence that Mother was living in a house under renovation with no furniture inside of it, and that Father lived in a hotel while remodeling a two-bedroom trailer he purchased that was not yet habitable.

[17] Ultimately, in evaluating the likelihood of remedied conditions, "the trial court must consider a parent's habitual pattern of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Bester*, 839 N.E.2d at 152. Mother and Father had opportunities in the past to address issues with housing that led to DCS involvement. Then, during the pendency of the instant matter, Mother and Father had three years to prioritize housing. They did not

---

[3] The court also found that "[w]hile Father did admit that he was responsible for ensuring the children had safe, stable, and secure housing, Father's actions since 2009 prove that he has failed to provide said housing to the children over the course of their involvement with the DCS." App. Vol. 2 at 77. Father challenges this finding, asserting that "[t]he testimony does not support a finding that Father had failed to provide housing since 2009." Father's Br. at 20. Yet, the finding fairly addresses the failure to provide *safe, stable, and secure* housing over the years—and the evidence supports the court's identification of recurrent housing issues.

do so. We are thus not persuaded that the court clearly erred in determining that there is a reasonable probability that the conditions that resulted in the Children's removal from the home would not be remedied.[4]

## Best Interests

[18] In determining whether terminating parental rights is in the best interests of a child, the court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In doing so, the trial court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Moreover, "the recommendations of the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re I.A.*, 903 N.E.2d 146, 155 (Ind. Ct. App. 2009).

[19] We have already determined that there is sufficient evidence that the housing-related conditions would not be remedied. Furthermore, the Children's case manager, guardian ad litem, and special advocate all recommended terminating

---

[4] Mother and Father also direct argument toward other findings, including those related to the likelihood of remedied parental supervision and those related to whether continuation of the parent-child relationship poses a threat to the Children. Because we identify sufficient evidence to support the requisite statutory element based upon home conditions, we do not address other statutory grounds for termination.

parental rights, noting—among other things—the need for permanency and the length of time the Children had been out of the home. There was evidence that each removal inflicted a degree of trauma upon a child, and that some of the Children had been removed four times. All of the Children faced the potential for additional DCS involvement with the prospect of ongoing issues with Mother's and Father's home conditions. There was evidence that some of the Children initially had behavioral issues—with J.N., in particular, displaying explosive behaviors and difficulty regulating emotions—but that the Children had made improvements over the course of receiving services, and that they were bonded to their foster parents who planned to adopt them.

[20] Although Father does not make a best-interests argument, Mother asserts that her "efforts were thwarted" because the Children were out of her care while she was incarcerated, Mother's Br. at 13, and that she "was given no opportunity to expand her visitation thus denying her the ability to demonstrate improved parenting skills," *id.* at 14. Yet, Mother ignores that the Children were outside of the home due to her own criminal neglect, and that the visits did not progress beyond weekly supervised visits because of concerns that Mother could not safely supervise the Children. Moreover, the evidence supports the finding that her "incarceration for neglect of a dependent is partially, though not solely, to blame for . . . lack of progress." Mother's App. Vol. 2 at 74.

We cannot say that the trial court clearly erred in determining that termination of the parent-child relationship is in the Children's best interests.[5]

Affirmed.

Mathias, J., and Bradford, J., concur.

---

[5] Mother and Father do not dispute that the plan for the Children was adoption by their foster parents, and neither directs argument to whether adoption is a satisfactory plan. At one point, Mother baldly asserts that DCS failed to meet its burden as to whether "there existed a satisfactory plan," Mother's Br. at 10, but she later suggests only that a finding as to this final element "was premature . . . because the Termination ought never to have been filed" or, in the alternative, that there is insufficient evidence as to other elements, *id.* at 14. Nonetheless, to the extent Mother is challenging the sufficiency of the evidence, we note that adoption is a satisfactory plan. *E.g.*, *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied.*