## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 14 2019, 6:55 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joann M. Price Franklin
Merrillville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Benjamin M. L. Jones
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of D.H., Jr. and Ar.L. (Minor Children); <br><br> An.L. (Mother), <br><br> *Appellant-Respondent,* <br><br> v. <br><br> Indiana Department of Child Services, <br><br> *Appellee-Plaintiff.* | November 14, 2019 <br><br> Court of Appeals Case No. 19A-JT-907 <br><br> Appeal from the Lake Superior Court <br><br> The Honorable Thomas P. Stefaniak, Jr., Judge <br><br> Trial Court Cause Nos. 45D06-1809-JT-287 45D06-1809-JT-288 |

**Najam, Judge.**

# Statement of the Case

An.L. ("Mother") appeals the juvenile court's termination of her parental rights over her minor children, D.H., Jr. and Ar.L. (collectively, "Children").[1] Mother raises three issues for our review, which we consolidate and restate as whether the juvenile court clearly erred when it terminated her parental rights.

We affirm.

# Facts and Procedural History

Mother gave birth to D.H., Jr. on May 27, 2015. On July 14, 2016, the Indiana Department of Child Services ("DCS") received a report that D.H., Jr. had suffered a "near fatality" and had been taken to the hospital because he was "unresponsive." Tr. Vol. II at 22. In response to the report, DCS Family Case Manager ("FCM") Jennifer Miller visited the hospital. When she arrived, FCM Miller spoke with detectives from the Merrillville Police Department, who had also been called regarding the situation with D.H., Jr. The detectives informed FCM Miller that they had responded to the home and that the home was "filthy, deplorable, with garbage, various debris all over the home, standing urine and feces in the toilets. . . . There was a foul odor in the home." *Id*. The officers also told FCM Miller that they had had "numerous" calls to Mother's home in the past regarding domestic violence between Mother and Father. *Id*.

---

[1] The Children's father, D.H. ("Father"), does not participate in this appeal.

[4] After she spoke with the detectives, FCM Miller spoke with Mother. Mother told FCM Miller that she "didn't know what happened" to D.H., Jr. *Id.* at 23. Mother also admitted that "the home wasn't in the best condition." *Id.* At that time, DCS removed D.H., Jr. from the home. On July 28, 2016, DCS filed a petition alleging that D.H., Jr. was a Child in Need of Services ("CHINS"). Thereafter, the juvenile court held a fact-finding hearing on the CHINS petition. At the hearing, Mother admitted to the allegations, and the court adjudicated D.H., Jr. a CHINS. The court then entered its dispositional decree and ordered Mother to participate in services, including a substance abuse assessment, an initial clinical assessment, a parenting assessment, and a domestic violence assessment, and to follow all recommendations of the service providers. The court also authorized Mother to participate in supervised visitation with D.H., Jr.

[5] During the CHINS proceedings regarding D.H., Jr., Mother gave birth to another child, Ar.L., on July 12, 2017. In November, DCS received a report that Mother was not providing proper medical care for Ar.L. Specifically, the report indicated that Mother had taken Ar.L to the hospital, that the hospital had prescribed medications for Ar.L., that Mother did not fill those prescriptions, and that Mother had later returned to the hospital when Ar.L.'s symptoms worsened. The report also indicated that Mother had failed to take Ar.L. to get her two-month vaccinations. As a result of the report, FCM Laura Middleton contacted Ar.L.'s attending physician at the hospital. The doctor informed FCM Middleton that Ar.L. had been diagnosed with bacterial

meningitis and admitted to the hospital. He further told FCM Middleton that, had Ar.L "received her two month immunization shots," those shots "could've possibly prevented" the meningitis. Ex. Vol. II at 46.

[6] Thereafter, on November 14, 2017, DCS filed a petition alleging that Ar.L. was a CHINS. In that petition, DCS alleged that Mother had failed to obtain appropriate medical care for Ar.L., that Mother had never taken the necessary steps to obtain a Medicaid card for Ar.L., and that Mother "has a history of ignoring her own personal health care needs and has ignored her medical needs caused by her diabetes," which lack of care resulted in Mother passing out in her car with the Children inside. *Id.* at 58. Ar.L. was released from the hospital on December 30. Due to DCS's concerns regarding Ar.L's medical care, Mother's homelessness,[2] and continued reports of domestic violence between Mother and Father, DCS removed Ar.L. from Mother's care at that time. Following a fact-finding hearing, the juvenile court found that Ar.L. was a CHINS. The court then ordered Mother to participate in services.

[7] Mother was not compliant with services. She canceled her home-based case work services "a lot," and she only contacted her caseworker "if she needed transportation." Tr. Vol. II at 31. Mother also failed to follow through with scheduling or maintaining appointments. Mother completed the parenting education for D.H., Jr., but she did not complete the parenting education for

---

[2] Mother was evicted from her home in or around December 2017.

Ar.L., which education was meant to address Ar.L.'s special needs. Mother was also inconsistent with her therapy, and she failed to complete "anything" with regards to the domestic violence services. *Id*. at 32. And Mother completed her medication evaluation, but she only took the prescribed medication "for around one month." *Id*.

[8] Mother was also not consistent with her supervised visitation. And when Mother attended the visits, there were "safety concerns" since Mother and Father would often argue in front of the Children. *Id*. DCS had to put a safety plan in place, which prevented Mother and Father from attending the visits at the same time. DCS was never able to "graduate" Mother to unsupervised visits with Children "[d]ue to the inconsistency with the visitation, the continued and ongoing reports of domestic violence between the parents, [and her] lack of housing." *Id*. Additionally, throughout the CHINS proceedings, DCS attempted two trial home visits with Mother. However, the first trial visit failed after Mother was evicted from her home. And the second trial visit failed "due to domestic violence concerns, lack of follow-up on medical care[,] and noncompliance with services. *Id*. at 36.

[9] On September 27, 2018, DCS filed petitions to terminate Mother's parental rights over Children. Following a fact-finding hearing on March 20, 2019, the juvenile court entered the following findings of fact and conclusions of law:

> There is a reasonable probability that the conditions that resulted in the removal of the children from [their] parents' home will not be remedied in that: The Department of Child Services became

involved with this family in July 2016 when the Department received a referral for a child, namely [D.H., Jr.] who was a near-fatality. The home was in deplorable condition. The home had feces throughout the home. Neither parent had any knowledge as to what happened to [D.H., Jr.]. The investigation revealed numerous reports of domestic violence between the [M]other and [F]ather. [D.H., Jr.] and a sibling, [A.K.] were removed from the home. The children were placed in relative placement.

Mother gave birth to another child in July of 2017, namely [Ar.L.] The child was not a ward initially, but at about four months of age, a referral was received. The investigation revealed that the child was at the hospital and the child was extremely dirty. [Ar.L] was medically neglected. The child did not have proper vaccinations. The child was ill and was given medications, but parents did not fill the medications. [Ar.L.] ended up back in the hospital and was air lifted to Comer's Hospital. Parents were homeless and there were multiple issues of domestic violence. . . . The child was removed from parental care due to the neglect of the parents.

* * *

Mother did not participate with the home based caseworker. Mother only contacted the provider when she needed transportation. Mother was not compliant with the services offered through the case plan. Mother has been very inconsistent with visitations with the children. Mother and [F]ather have separate visitations due to the continuous arguing between the parents. The parents would often appear at the visits together and leave the visits before [they were] over. A safety plan was instituted. . . . Mother did not become vested in services and [has] shown no interest in participating in the services. . . . Mother is unable to provide for the basic needs of her children.

* * *

Mother and Father continue with their domestic violence issues. Neither parent has addressed their domestic violence issues. Grandmother/caregiver testified that the parents live in a car in her driveway. Grandmother further testified that [M]other and [F]ather have a very toxic relationship and the police are called on a consistent basis. Grandmother further indicated that the environment that the parents create is very unhealthy and the [C]hildren's safety would be in jeopardy if left in the care of either parent.

Both [M]other and [F]ather continue with their homelessness. Both [M]other and [F]ather are known to be living in a van. Neither parent can provide for the basic needs of the [C]hildren. Neither parent is able to provide a safe and stable environment, free from domestic violence for the [C]hildren. The probability of either parent finding stable, safe housing is extremely low.

* * *

Mother and Father testified at the fact[-]finding hearing on the petition to terminate their parental rights. Clearly, there [is] some mental illness that is not being addressed with each parent. Both [M]other and [F]ather would not directly answer the questions asked of them and would go off on a tangent. Neither parent could focus.

Neither parent is providing any emotional or financial support for the [C]hild[ren]. Neither parent has completed any case plan for reunification. Neither parent is in a position to properly parent these [C]hildren. The [C]hildren are in relative placement and are bonded and thriving.

Despite multiple attempts of reunification, the [C]hildren remain outside of the parents' care. The original allegations of neglect have not been remedied by the parents. Neither of these parents have demonstrated an ability to independently parent the [C]hildren and provide any necessary care, support[,] and supervision. There is no basis for assuming the parents will complete the necessary services and find one or both of themselves in a position to receive the [C]hildren into their care and if the [C]hildren were returned to either parent, the [C]hildren would be homeless. For almost three years, the parents failed to utilize the available services and make the necessary efforts to remedy the condition, which led to intervention by DCS and the Court.

The [C]hildren continue to reside in stable relative placement. Maternal grandmother has indicated both a willingness and ability to adopt the [C]hildren. It would be unfair to the [C]hildren to delay such permanency on the very remote likelihood of the parents committing to completing services.

The Indiana Supreme Court has held that at some point in time a child's right to permanency outweighs a parent[']s ever important right to parent. The Court finds that after almost three years, in these cases, [the Children] certainly have a right to permanency.

There is a reasonable probability that the continuation of the parent-child relationship posts a threat to the well-being of the [C]hildren in that: for the reasons stated above. Additionally, the [C]hildren deserve a loving, caring, safe and stable home.

It is in the the best interest of the [C]hildren and [their] health, welfare[,] and future that the parent-child relationship between the [C]hildren and [their] parents be forever fully and absolutely terminated.

> The Indiana Department of Child Services has a satisfactory plan for the care and treatment of the [C]hildren[,] which is adoption by the grandmother.

Appellant's App. Vol. II at 2-4. In light of its findings and conclusions, the court terminated Mother's parental rights over Children. This appeal ensued.

# Discussion and Decision

## *Standard of Review*

[10] Mother appeals the trial court's termination of her parental rights over Children. We begin our review of this appeal by acknowledging that "[t]he traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *Bailey v. Tippecanoe Div. of Fam. & Child. (In re M.B.)*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Schultz v. Porter Cty. Off. of Fam. & Child. (In re K.S.)*, 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.* at 836.

[11] Before an involuntary termination of parental rights can occur in Indiana, DCS is required to allege and prove:

> (B) that one (1) of the following is true:
>
>> (i)  There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii)  There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> * * *
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2018). DCS's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *R.Y. v. Ind. Dep't of Child Servs. (In re G.Y.)*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting I.C. § 31-37-14-2).

[12]  When reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *Peterson v. Marion Cty. Off. of Fam. & Child. (In re D.D.)*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous.

*Judy S. v. Noble Cty. Off. of Fam. & Child. (In re L.S.)*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[13] Here, in terminating Mother's parental rights, the trial court entered specific findings of fact and conclusions thereon. When a trial court's judgment contains special findings and conclusions, we apply a two-tiered standard of review. *Bester v. Lake Cty. Off. of Fam. & Child.*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings and, second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[14] On appeal, Mother contends that the juvenile court erred when it took judicial notice of certain facts, that the juvenile court clearly erred when it concluded that the conditions that resulted in the Children's removal from her care will not be remedied, and that the court erred when it concluded that DCS has a satisfactory plan for the care and treatment of the Children.[3] We address each argument in turn.

---

[3] Mother also briefly states that "the case plan was not satisfactory and terminating Mother's parental rights was not in the best interests of the Children[.]" Appellant's Br. at 15 (emphasis removed). To the extent this statement purports to challenge the trial court's conclusion that the termination of her parental rights is in the Children's best interests, Mother does not present cogent argument in support of that contention, and it is waived.

### *Judicial Notice*

[15]   Mother first contends that the juvenile court erred when it took judicial notice of "facts that were not adduced in evidence" at the fact-finding hearing. Appellant's Br. at 10 (emphasis removed). We first note that Mother has not directed us to any particular "fact" she believes the court noticed, nor has she directed us to any location in the record where the court took notice of any fact. However, it appears as though Mother asserts that the juvenile court improperly took judicial notice of records from the underlying CHINS proceedings, which records include letters from two therapists who had expressed concerns regarding Mother's mental health. *See* Ex. Vol. I at 78, 80. And Mother contends that, without those records, there "was nothing introduced at the fact[-]finding hearing by way of testimony or documents that support[s] the court[']s conclusions about Mother's mental health[.]" *Id.* at 12.

[16]   Mother's argument misses the mark. The juvenile court did not take judicial notice of the records from the underlying CHINS proceedings. Rather, the State moved to admit those records as evidence, which the court admitted following Mother's statement that she had "[n]o objection." Tr. Vol. II at 39. Accordingly, the court did not improperly take judicial notice of any records or facts. And because the court admitted records regarding Mother's mental health as evidence at the fact-finding hearing, there is evidence to support the court's finding regarding Mother's mental health.

### *Reasons for Removal from Mother's Home*

[17]  Mother next contends that the juvenile court erred when it concluded that the conditions that resulted in the Children's removal from Mother's care will not be remedied. However, Mother does not challenge the juvenile court's conclusion that there is a reasonable probability that the continuation of the parent-child relationships poses a threat to the well-being of the Children. Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, and the court terminated Mother's parental rights based not only on its conclusion that conditions that resulted in the Children's removal from Mother will not be remedied but also its conclusion the continuation of the parent-child relationship poses a threat to the well-being of the Children. Thus, Mother's failure to challenge the second prong of that subsection means she has waived our review of the sufficiency of the evidence to support the court's conclusion on either prong.[4]

### *Satisfactory Plan*

[18]  Finally, Mother asserts that the trial court erred when it concluded that DCS has a satisfactory plan for the care and treatment of the Children. Indiana courts have traditionally held that for a plan to be satisfactory, for the purposes of the termination statute, it need not be detailed, so long as it offers a general

---

[4] Waiver notwithstanding, the juvenile court's findings clearly support the court's conclusion that the conditions that resulted in the Children's removal and the reasons for their placement outside of Mother's home will not be remedied and that there is a reasonable probability that the continuation of the parent-child relationships poses a threat to the well-being of the Children.

sense of the direction in which the child will be going after the parent-child relationship is terminated. *K.W. v. Ind. Dep't of Child Servs. (In re A.S.)*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014) (citation omitted), *trans. denied*. A DCS care plan is satisfactory if the plan is to attempt to find suitable parents to adopt the children. *Id*. Here, DCS presented evidence that Children's maternal grandmother, with whom Ar.L. is currently placed and with whom D.H., Jr. frequently stays, plans to adopt them.

[19] Mother contends that the plan for the maternal grandmother to adopt the Children is not satisfactory because Mother has "daily contact" with her mother. Appellant's Br. at 15. Mother maintains that, because the court concluded that her "continued involvement with the Children posed a threat to their health and safety, then finding that the placement and care of the Children should rest with the maternal grandmother who maintains daily contact with Mother was wholly unreasonable." *Id*. (emphasis removed). In other words, Mother contends that the maternal grandmother is not a suitable person to adopt the Children.

[20] However, we need not address whether the maternal grandmother is a suitable adoptive parent. It is within the authority of the adoption court, not the termination court, to determine whether an adoptive placement is appropriate. *See id*. We conclude that the juvenile court did not err when it determined that DCS's plan of adoption was satisfactory.

[21] In sum, we affirm the juvenile court's termination of Mother's parental rights over Children.

[22] Affirmed.

Bailey, J., and May, J., concur.