## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 12 2020, 10:54 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Donald E. C. Leicht
Deputy Public Defender
Peru, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of Parental Rights of:

A.B. *(Minor Child)*

and

C.B. *(Father)*,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services (DCS),

*Appellee-Petitioner,*

March 12, 2020

Court of Appeals Case No.
19A-JT-1885

Appeal from the Howard Circuit Court

The Honorable Lynn Murray, Judge

Trial Court Cause No.
34C01-1902-JT-44

**Robb, Judge.**

# Case Summary and Issue

[1] A.B. ("Child") was born on February 22, 2011, to J.A. ("Mother") and C.B. ("Father").[1] Child was found to be a child in need of services ("CHINS") in 2018, and a petition for the involuntary termination of Mother's and Father's parental rights was filed in 2019. After a hearing, the juvenile court determined that Father's parental rights should be terminated.[2] Father appeals the termination of his parental rights and we address the following issue: whether the juvenile court's termination order is clearly erroneous. Concluding that it is not, we affirm.

# Facts and Procedural History

[2] On August 5, 2017, Child was removed from Mother's home due to allegations of neglect, exposure to domestic violence in the home, and physical abuse of Child and her half-brother. At that time, Father's whereabouts were unknown and he had not seen Child for approximately two years. Child was placed with her maternal grandparents. The Department of Child Services ("DCS") published notice to Father of the CHINS petition. Father saw the notice in January 2018 and contacted DCS. The family case manager ("FCM") was then able to meet with Father in February of 2018 and "explained to him what

---

[1] Father's paternity was established in 2013.

[2] Mother voluntarily consented to Child's adoption and does not participate in this appeal. *See* Appendix of Appellant, Volume 2 at 40.

services we could provide[:] that if he would submit to drug screens, that we could [get] visits started and what we could do to help him get [Child] back with him." Transcript of Evidence, Volume II at 41. The FCM was only able to meet with Father one time after this initial meeting, however, due to difficulties getting in touch with Father, and visits were never arranged. Following a fact-finding hearing at which Father failed to appear, the juvenile court adjudicated Child a CHINS on March 12, 2018. At some point following the fact-finding hearing but prior to the disposition hearing, a public defender was appointed to represent Father. Father's public defender appeared at the disposition hearing, but Father failed to appear in person. Among other things, Father was ordered to cooperate with DCS and its family case managers and service providers, maintain contact with the assigned FCM, and follow all recommendations. *See* Exhibit, Volume III at 35.

[3] At a periodic review hearing on April 2, 2018, Father appeared by counsel only; the juvenile court found that Father had not complied with the case plan, had not enhanced his ability to parent Child, and had not cooperated with DCS. Supervised and therapeutic visits between Father and Child were being arranged but had not begun. At a periodic review hearing on June 25, 2018, Father's public defender was released due to Father's lack of participation in services, visitations, or court proceedings. The juvenile court found that Father had not complied with the case plan, cooperated with DCS, or visited Child. Father appeared at a review hearing on October 29, 2018, in the custody of the Howard County Sheriff's Department where he was being held on multiple

criminal charges. Father also had pending charges in Marion County at this time. He declined appointment of a public defender and thereafter did not appear, in person or by counsel, at a review hearing in February 2019. The juvenile court again found that Father had not complied with the case plan, cooperated with DCS, visited with Child, or enhanced his ability to fulfill his parental obligations.

[4] DCS filed a petition for involuntary termination of parental rights on February 22, 2019. Father appeared telephonically at the initial hearing and a public defender was appointed to represent him. Father was transported by the Howard County Sheriff's Department to the June 2019 termination hearing, where he testified that he had seen Child two times after his paternity was established in 2013, but Mother blocked his efforts to see Child thereafter. He acknowledged that he would need to build a relationship with Child but stated that after his release from incarceration—at the earliest, on June 6, 2020—he would have stable housing with his wife and would immediately seek employment. He asked that Child be continued in her relative placement until he was released from jail and could establish that relationship.

[5] Doris Wolf, a family educator with the Family Service Association, received a referral in February 2018 to work with Father. She was only able to meet with Father a couple of times before her involvement ended in November or December of 2018. She was tasked with working with Father on transportation, employment, housing, and visits. But she was never able to observe Father interacting with Child and no progress was made with the other

goals because, despite twice weekly efforts to make contact with Father, "[w]e were just unable to find him." Tr., Vol. II at 31. Wolf's concern if Child was placed in Father's care was that Child "doesn't know him and their lifestyle[.]" *Id.* at 29. FCM Mike Deardorff noted that Father had not made any progress toward reunification as Father had been incarcerated at least twice during the proceedings, had never visited with Child, and had not followed through with any of the services offered to him: "[W]e've offered services to [Father] over the course of this case. He's never taken advantage of those. . . . I gave him cards so that he could contact me . . . if I couldn't find him. He's never done that. He's never done anything that we've asked [him] to do to try to get his daughter back[.]" *Id.* at 50. Deardorff opined that it would be in Child's best interests for Father's parental rights to be terminated because she does not know Father, has never had "any kind of relationship with him at all" and to pull her away from the stable environment the grandparents have provided "would be so damaging to [her] and [she has] a normal life now. [She has] an opportunity for that." *Id.* at 55. The court appointed special advocate ("CASA") agreed that it would be in Child's best interests for Father's parental rights to be terminated, primarily because of the timeline: "I'm just concerned about the amount of time it would take him to get to the point where he could . . . have her live with him." *Id.* at 71.

[6] The juvenile court issued its order terminating Father's parental rights on July 19, 2019, finding:

29. Father's participation in the CHINS case and in [Child's] life have been essentially nonexistent. At no time during this case has Father actively participated or shown any effort towards establishing a relationship with [Child]. Father has not worked with any providers to address his inability to provide care for [Child] and has not participated in any visitation. Father has only appeared at hearings on an involuntary basis by virtue of his incarceration.

* * *

31. Father has had absolutely no contact with [Child] since 2014, in which he had one visit with [Child] for the first time since mid-2012. Once the DCS was able to locate Father, he was given the opportunity to reestablish a relationship with [Child], starting with therapeutic visitation. Father's own inaction resulted in those visits never occurring. . . .

32. At the time of the Child's removal in August of 2017 Father's whereabouts were unknown. Thus, the primary condition for Child's removal as to Father at the time of removal was his inability to provide supervision and care to the Child. Father first made contact with FCM Deardorff in January 2018, at which point he was not able to take the Child into his care due to lack of employment and housing in addition to the complete lack of relationship Father had with the Child, who was six (6) years old at the time. FCM Deardorff began putting services into place for Father at that time to address his needs for employment, housing, transportation, and therapeutic visitation to reestablish a relationship with [Child]. However, Father was unwilling to work with the DCS and its providers, to visit his daughter, to show any tangible interest in reunification, and to follow the law. Father's whereabouts were regularly unknown during the life of this case and when his whereabouts were known it was generally due to his incarceration. Through his

actions, Father has repeatedly and continuously placed his own self-interests and needs above the needs of his daughter.

Appealed Order at 8-9. Based on these findings, the juvenile court concluded:

42. This Court finds by clear and convincing evidence that it is reasonably probable that the conditions that led to the removal and that led to the continued placement outside the home, namely Father's inability to provide a safe home for the Child and to safely care for the Child, Father's refusal to address the reasons for his inabilities, and the lack of any relationship between Father and Child will not be remedied to the degree that Father will be able to provide the Child with the nurture, stability, and care that she requires on a long term basis.

* * *

44. The Court further finds by clear and convincing evidence that the continuation of the parent-child relationship between the Child and her Father poses a threat to the well-being of the [C]hild. . . . Father has, for the entirety of not only the CHINS case, but for the majority of the Child's life, failed to provide any form of parenting to the Child. . . . The Court finds that the Father's lack of participation in services, his frequent incarcerations, his consistent choice to put his interests in front of his Child's needs, and the complete lack of any relationship between Father and Child demonstrate Father's inability to provide a safe, stable, and caring environment for the Child.

45. The Court further finds by clear and convincing evidence that termination of the parent-child relationship of the Father to the Child is in the best interests of the Child in that further efforts to reunite the Father with the Child are unlikely to succeed. . . . The failure to terminate the relationship will deny the [C]hild stability and permanency to which she is entitled and which has

too long been denied. It is in the [C]hild's best interest to have permanency, not perpetual wardship and uncertainty in her life.

*Id.* at 13-15. Father now appeals.

# Discussion and Decision

## I. Standard of Review

Parents have a right to establish a home and raise their children that is protected by the Fourteenth Amendment to the United States Constitution. *In re D.D.*, 804 N.E.2d 258, 264 (Ind. Ct. App. 2004), *trans. denied.* Although parental rights are of a constitutional dimension, they are not without limitation and the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). The involuntary termination of one's parental rights is the most extreme sanction a court can impose because termination severs all rights of a parent to his or her children. *See In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, termination is intended as a last resort that is available only when all other reasonable efforts have failed. *Id.*

When reviewing the termination of parental rights, we do not reweigh the evidence or judge the credibility of witnesses. *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 371 (Ind. Ct. App. 2007), *trans. denied*. Instead, we consider only the evidence most favorable to the judgment and the reasonable inferences that can be drawn therefrom. *Id.* Deferring to the trial court's

unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*; *cert. denied*, 534 U.S. 1161 (2002). Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

As required by Indiana Code section 31-35-2-8(c), the juvenile court entered findings of fact and conclusions thereon. Therefore, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings, then determine whether the findings support the judgment. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

## II. Termination of Father's Parental Rights

Before an involuntary termination of parental rights may occur in Indiana, DCS must allege and prove, in relevant part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove these elements by clear and convincing evidence. Ind. Code § 31-37-14-2. However, because subsection (b)(2)(B) is written in the disjunctive the juvenile court need only find one of the three elements in that subsection has been proven by clear and convincing evidence. *See, e.g., In re I.A.*, 903 N.E.2d 146, 153 (Ind. Ct. App. 2009).

[11] We begin by noting that Father does not challenge any of the juvenile court's findings; therefore, we accept the findings as true. *McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997). Nor does Father specifically challenge any of the juvenile court's conclusions. We have therefore considered the evidence, findings, and conclusions holistically, to determine if the termination order is justified.

[12] With respect to whether DCS proved there is a reasonable probability that the conditions that resulted in Child's removal and continued placement outside Father's care will not be remedied, we engage in a two-step analysis: "First, we

must ascertain what conditions led to [Child's] placement and retention in foster care. Second, we determine whether there is a reasonable probability that those conditions will not be remedied." *In re K.T.K.*, 989 N.E.2d 1225, 1231 (Ind. 2013) (quotation omitted).

[13] Child was removed and subject to CHINS proceedings due to issues in Mother's home, but at the time of her removal, Father's whereabouts were unknown, and he had not been in contact with Child for approximately two years. That has not changed over the course of these proceedings. Father has still not had any contact with Child, even though DCS was willing to facilitate visits. Father was often unreachable and when DCS and service providers did manage to make contact, usually when Father was in jail, Father failed to follow through with any service recommendations. As the juvenile court noted, "Father's participation in the CHINS case and in [Child's] life have been essentially nonexistent." Appealed Order at 8. Father claimed that Mother kept him from being involved in Child's life,[3] but even after Mother was not making the decisions and DCS offered an opportunity for Father to be involved, he did not avail himself of that chance. DCS proved by clear and

---

[3] Father testified at the termination hearing that he, Mother, and Child lived as a family unit until Child was a year old. Father was not able to contact Mother or see Child after that until a paternity order was entered in October 2013. After paternity was established and it was agreed Father's visitation with Child would be phased in, he had two "splendid" visits with Child and then Mother refused to cooperate in scheduling further visits and became unreachable. Tr., Vol. II at 93-95.

convincing evidence that there is a reasonable probability that Father's inability or unwillingness to parent Child will not be remedied.[4]

[14] As for Child's best interests, Father is a stranger to her. She was no more than three years old the last time she was in Father's presence; she was eight at the time of the termination hearing. Even if Father gets out of jail in June 2020, has stable housing, and finds employment, it would still take a considerable amount of time for him to develop and then show a sustainable relationship with Child. Child had already been in foster care for nearly two years by the time of the termination hearing. Permanency is a central consideration in determining the best interests of a child. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1159 (Ind. Ct. App. 2013), *trans. denied*. By all accounts, Child is thriving in her relative placement. Deardorff, the DCS FCM; Wolf, a service provider; and Child's CASA all agreed that it was in Child's best interests for Father's parental rights to be terminated. We hold the juvenile court's conclusion that termination of Father's parental rights is in Child's best interests is supported by clear and convincing evidence.

[15] Finally, as to whether DCS has a satisfactory plan for Child's care and treatment, "[a] DCS plan is satisfactory if the plan is to attempt to find suitable parents to adopt the children." *In re A.S.*, 17 N.E.3d 994, 1007 (Ind. Ct. App. 2014), *trans. denied.* Here, the plan is for Child to be adopted by her maternal

---

[4] Thus, we need not consider whether DCS proved continuation of the parent-child relationship was a threat to Child's well-being. *See supra* ¶ 10.

grandparents, who have served as her relative placement since her removal from Mother's care. This is clear and convincing evidence of a satisfactory plan.

# Conclusion

If a juvenile court determines the allegations of a petition to terminate parental rights are true, then the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a). Here, the juvenile court made relevant findings, concluded that the allegations of DCS' petition were supported by clear and convincing evidence, and ordered the termination of Father's parental rights. After reviewing the evidence and the findings, we conclude the juvenile court's order is not clearly erroneous. The judgment of the juvenile court is therefore affirmed.

Affirmed.

Bradford, C.J., and Altice, J., concur.